## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JANE DOE, an individual Michigan resident
filing anonymously under a fictitious name,

              Plaintiff,

vs.                                                    CASE NO. 2:15-cv-10724
                                                       HON. STEPHEN J. MURPHY III
MAMOUN DABBAGH, M.D.,                                  HON. ELIZABETH A. STAFFORD

              Defendant.

---

| | |
|---|---|
| Nakisha N. Chaney (P65066) | STEPHEN M. RYAN PLLC |
| NACHT, ROUMEL, SALVATORE, | Stephen M. Ryan (P27717) |
| BLANCHARD & WALKER, P.C. | Attorney for Defendant |
| Attorney for Plaintiff | 30700 Telegraph Road, Suite 1677 |
| 101 N. Main Street, Ste. 558 | Bingham Farms, Michigan 48025 |
| Ann Arbor, Michigan 48104 | (248) 723-8500 |
| (734) 663-7550 | (2480 723-8501 (fax) |
| | smryanpllc@aol.com |

---

### AMENDED
### DEFENDANT'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S
### MOTION TO PROCEED WITH PSEUDONYMOUS STATUS

**ISSUE PRESENTED:**      Plaintiff filed the Complaint in this matter under a fictitious name, "Jane Doe."  May Plaintiff continue this case under such a pseudonym.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION................................................................................. 1

II.     THE ENTIRE FILE SHOULD BE SUPPRESSED BY AN APPROPRIATE
        PROTECTIVE ORDER.................................................................4

III.    ARGUMENT..............................................................................5

        A.    The Seminal Sixth Circuit Case..................................................5

        B.    Plaintiff has elected to file this case...............................................6

        C.    Defendant will be subject to unfair disadvantages in discovery..............7

        D.    Preliminary findings .............................................................10

## INDEX OF AUTHORITIES

**Page(s)**

*Doe v Porter, 370 F3d  558 (6th Cir. 2004)* …………………………………………5, 6

*State of Michigan v Dizzy Duck, 203 Mich 250 (1994)*…………………………8, 9

## **INDEX OF EXHIBITS**

Exhibit 1 — —  CV of Dr. Mamoun Dabbagh, M.D.

Exhibit 2  — —  Rite-Aid Prescription Records

NOW COMES the Defendant herein, Dr. Mamoun Dabbagh, by and through his attorney, Stephen M. Ryan, PLLC by Stephen M. Ryan, and submits this brief in opposition to Plaintiff's motion to proceed with pseudonymous status, Plaintiff having filed the Complaint in this matter as "Jane Doe."

## I.   INTRODUCTION

The Complaint filed in this matter is not only egregiously false, but also nothing short of outrageous and scandalous in its baseless allegations against the Defendant, Dr. Mamoun Dabbagh, a well-respected and preeminent psychiatrist who has been practicing in the Metro Detroit area for over thirty (30) years, see Exhibit 1, CV of Dr. Dabbagh;   for Plaintiff alleges in her Complaint that Dr. Dabbagh conspired with Plaintiff's pimp to prescribe drugs to Plaintiff which would have more easily allowed Plaintiff's pimp to control her.   Dr. Dabbagh has vigorously denied all of these scandalous allegations in his Answer to Complaint with Affirmative Defenses filed in this case.  (See Docket No. 6).

What is even more outrageous is that although Dr. Dabbagh did indeed prescribe two psychotropic drugs to Plaintiff[1] as part of his treatment of her as his patient (i.e., Celexa and Adderall), throughout her Complaint, Plaintiff alleges that these prescriptions somehow allowed her pimp, a Mr. Mark White, to more easily continue his control over Plaintiff in her profession of being a prostitute.   Any type of even a perfunctory pre-suit investigation would have revealed to Plaintiff that these drugs do **NOT** have the effects alleged in Plaintiff's Complaint.   Rather these drugs have just the

---

[1] Throughout her Complaint, Plaintiff continually references "psychotropic" drugs as if they are sinister or illegal.  "Psychotropic" drugs are merely drugs prescribed by a psychiatrist to a patient with an intended effect on the patient's mind.  When prescribed by a licensed psychiatrist like Dr. Dabbagh, they are 100% legal and usually very efficacious.

opposite effects on patients.  For Celexa treats depression and Adderall helps the patient by organizing the patient's mind to increase energy and to help the patient concentrate and focus his/her mind with the intended effect being that the patient becomes more energetic and then makes much better and more informed decisions in life.  (See Defendant's Answer to Complaint and Affirmative Defenses, Docket No. 6, ¶ 6).

Plaintiff alleges that she was befriended by Mr. White in January of 2013 and he then coerced her with threats and beatings into prostitution.  (See Complaint, Docket No. 1, ¶ 15-17).  But Dr. Dabbagh saw Plaintiff alone and prescribed these drugs on or about March 26, 2013 – some 2 or 3 months **after** Plaintiff was allegedly forced into a life of prostitution by White.  (See Exhibit 2, attached).  But as alleged in her Complaint, in early May, 2013, approximately one month after Plaintiff began taking these drugs prescribed by Dr. Dabbagh, the Plaintiff correctly decided to ignore Mr. White's threats and beatings and then, according to her Complaint, she walked across the street and filed a criminal complaint with the Southfield Police Department against Mr. White, which resulted in a police raid on Mr. White's condo a few days later which then freed Plaintiff from Mr. White's control, as he committed suicide when the police entered his condo.  (See Docket No. 1, ¶ 62-65).

Thus, it is beyond question that these drugs had the desired effects upon Plaintiff and were the impetus to Plaintiff making better and much more informed decisions in this case by going to the Southfield police.

Plaintiff further falsely alleges that Dr. Dabbagh knew Mr. White was a pimp (which he most definitely did not know) (see Answer, Docket No. 6, ¶ 71 and 71(a)) and

2

that he received money from Mr. White (which he most definitely did not receive) to prescribe these drugs to Plaintiff.   (See Answer, Docket No. 6, ¶ 6 and ¶ 54).

Dr. Dabbagh and Mr. Mark White lived in the same high-rise condo building in Southfield.   Upon information and belief, Mr. White lived on the 33rd floor and Dr. Dabbagh lived on the 20th floor.   They did not know each other but would say "hi" to each other whenever they met on the elevators.

One day Mr. White asked Dr. Dabbagh if he was psychiatrist (as he had been told by other neighbors), and Dr. Dabbagh answered that he was.   Mr. White then asked for Dr. Dabbagh's phone numbers, and Dr. Dabbagh gave him his office and cell phone numbers.

Sometime later, Dr. Dabbagh received a phone call on his cell phone and it was Mr. White, and Mr. White asked Dr. Dabbagh if he could come immediately to White's condo because his friend was having severe mental problems.   Out of a sense of duty to his profession, Dr. Dabbagh made the "house call" and went to Mr. White's condo. He asked Mr. White for privacy, and Mr. White went into another room.   Dr. Dabbagh then spoke to Plaintiff for 20 to 30 minutes, and then having made his diagnosis, he prescribed Celexa and Adderall to her and told her to follow-up with his office if she experienced any more problems.   At no time while they were alone did Plaintiff tell Dr. Dabbagh that she was being held against her will and being forced by Mr. White into prostitution.   (See Exhibit 2, attached).

The prescriptions were filled by Plaintiff on March 26, 2013.   See Ex. 2, attached. And then in early May, 2013, approximately 30 to 35 days after Plaintiff first started to take the two drugs prescribed to her by Dr. Dabbagh, the Plaintiff had an epiphany and

3

decided all of the sudden to ignore Mr. White's threats and beatings and to leave his condo and to cross the street and enter the Southfield Police Department to file a criminal complaint against Mr. White, which quickly led to a police raid on Mr. White's condo and to Plaintiff's ultimate freedom.  It is irrefutable that these drugs prescribed by Dr. Dabbagh had the intended effect of helping the Plaintiff make better and much more informed decisions.  (See Complaint, Docket No. 1, ¶ 62-65).

Dr. Dabbagh received no compensation whatsoever for his house call to Mr. White's condo to treat Plaintiff, and his office never even billed Plaintiff for the professional services rendered to her.

## II.   THE ENTIRE FILE SHOULD BE SUPPRESSED BY AN APPROPRIATE PROTECTIVE ORDER.

Proving the adage that no good deed goes unpunished, Plaintiff decided to sue Dr. Dabbage in this lawsuit, since the proper defendant, Mr. White, was dead.

If Plaintiff's allegations are true about Mr. White forcing her into prostitution, then that period of Plaintiff's life is truly tragic.  But it is Mr. White who is to blame, and just because is now dead, this does not give Plaintiff free reign to sue Dr. Dabbagh, making these false, outrageous and scandalous allegations against Dr. Dabbagh which, if believed by an uninformed reader who does not know Dr. Dabbagh, tend to injure and destroy his reputation and professional standing.

Defendant's counsel is not opposed to (and in fact supports) the suppression of the entire file *ab initio* via a properly drafted protective order as Dr. Dabbagh does not wish these false and scandalous allegations to continue to exist in the public domain.

4

And Defendant will shortly be filing a motion to suppress the entire file, as Plaintiff's counsel will not stipulate to protective order suppressing the entire file.

However, for the reasons set forth *infra*, Defendant is adamantly opposed to the Plaintiff being allowed to continue to proceed under a pseudonym.

## III.   ARGUMENT

### A.   The Seminal Sixth Circuit Case.

The seminal case in the Sixth Circuit dealing with pseudonymous filings by plaintiffs is *Doe v Porter*, 370 F3d 558 (6th Cir. 2004).   In *Porter*, the court held that F.R.Cv.P 10(a) requires that a complaint must state the names of all parties.   But the court went on to hold as follows:

> However, we may excuse plaintiffs from identifying themselves in certain circumstances.   Several considerations determine whether a plaintiffs privacy interests substantially outweigh the presumption of open judicial proceedings.   **They include** (1) whether the plaintiffs seeking anonymity are suing to challenge governmental activity; (2) whether prosecution of the suit will compel the plaintiff to disclose information "of the utmost intimacy"; (3) whether the litigation compels plaintiffs to disclose an intention to violate the law, thereby risking criminal prosecution; and (4) whether the plaintiffs are children. [Emphasis added].

Even though as per *Porter* there may be more factors or considerations than these four stated in *Porter*, each of these four is addressed *seriatim*.

First, Plaintiff is not suing to challenge governmental activity, so this factor cuts against granting Plaintiff's motion.

Second, will Plaintiff be compelled to disclose information of the "utmost intimacy."   This factor would, at first blush, appear to support Plaintiff's motion but only if this Court is to accept all of Plaintiff's allegations in her Complaint as true, and such

allegations are vehemently denied by the Defendant. In addition, this factor would weigh against Plaintiff's motion if it turns out that Plaintiff has in fact ever engaged in acts of prostitution **before** meeting Mr. White.

Thirdly, if indeed Plaintiff is to be believed that she was forced into a life of prostitution against her will, then there is no *mens rea* on behalf of the Plaintiff and thus there can be no violation of any law by Plaintiff. And as a practical matter, the police were out to help Plaintiff, not prosecute her for prostitution; and any such prosecution would have been initiated years ago.

Finally, there have been no allegations that Plaintiff is a minor, so the fourth factor cuts against granting Plaintiff's motion.

**B.      Plaintiff has elected to file this case.**

As stated in *Porter*, there may be more considerations than these four factors listed in *Porter*.

One additional consideration is that Plaintiff voluntarily decided to file this civil case against Dr. Dabbagh, and under American civil jurisprudence, that decision by Plaintiff has consequences. For instance, an individual may have many medical matters contained in his/her medical records which he/she desires to keep secret under the doctor/patient privilege, such as, say, a diagnosis of syphilis. But if such an individual decides to sue his/her doctor for medical malpractice, the entire medical records are no longer privileged and are completely discoverable. These medical secrets and issues of "the utmost intimacy" would come forward as a result of the decision to sue. The same should apply to Plaintiff. Plaintiff decided to sue Dr.

6

Dabbagh. She should not be allowed to hide behind a fictitious name and then hurl scandalous allegations at Dr. Dabbagh as to his professional standing and ethics.

### C.   Defendant will be subjected to unfair disadvantages in discovery.

Another consideration is that allowing Plaintiff to proceed under a fictitious name will make discovery very difficult, if not impossible, for Defendant. Plaintiff is placing her medical history at issue in this case, especially her psychiatric medical history and so how, for example, is Defendant to subpoena Plaintiff's medical records when we cannot use her name in the subpoena; otherwise, when the subpoena and proof of service are filed with the Court, her real name would be divulged.

In her Complaint, Plaintiff has alleged that the deceased Mr. White forced and coerced her into prostitution. Paragraphs 10 -12 of Plaintiff's Complaint read as follows:

> "10.  In July or August of 2012, White approached Plaintiff in a luxury high-rise elevator. Noting that Plaintiff was a masseuse, White told Plaintiff that he had a business opportunity and asked her to contact him.
>
> 11.  Plaintiff later contacted White.
>
> 12.  In meeting with Plaintiff, White told Plaintiff that she could provide therapeutic prostate massages and assured her that the massages were legal and served a medical purpose." See page 3 of Plaintiff's Complaint, Docket No. 1.

There are two types of masseuses:  (1) the legal, licensed therapeutic type, and (2) the unlicensed type usually engaged in the illegal sex industry.

So Plaintiff was, by her own admission, a masseuse **before** she ever met White. Defendant is now therefore desirous of issuing a subpoena as to state records to see if in fact Plaintiff was ever licensed by Michigan as a masseuse, as such information is

critical to Plaintiff's claim that White forced her into prostitution and Plaintiff's claim that he was aided in this endeavor by the prescribed drugs.

At first, Defendant was not certain of Plaintiff's name, only that her initials are "J.C." So how was Defendant to subpoena licensure records from the State of Michigan when Plaintiff's real name was not known; for the subpoena cannot seek the licensure records of "Jane Doe." However, in a phone conversation with Plaintiff's counsel on April 22, 2015, Plaintiff's counsel informed the undersigned of Plaintiff's name.

But even more importantly, even if Plaintiff's real name is known to Defendant and placed on the subpoena, how is Defendant to e-file the subpoena and return of service with the Court, for to do so would reveal Plaintiff's name.

In this same phone call on April 22, 2015, the undersigned asked Plaintiff's counsel if Plaintiff was ever licensed by the State of Michigan as a masseuse and she said she didn't know. And in this same phone conversation, the undersigned asked Plaintiff's counsel if Plaintiff had ever worked in a strip club, and Plaintiff's counsel answered that she would not talk to the undersigned about answering that question.

But in *State of Michigan v Dizzy Duck*, 203 Mich 250 (1994), the Michigan Supreme Court ruled that "lap dancing" as publicly practiced in strip clubs is, in fact, prostitution. And a ruling by the Michigan Supreme Court, as in the *Dizzy Duck* case, is binding precedent on this Court.

Many cities in Michigan require dancers in strip clubs to be licensed, so Defendant fully intends to subpoena these cities, including Detroit, to ascertain if Plaintiff was ever licensed as an "exotic dancer." But again, the problem arises as to the e-filing of the subpoena and related proof of service.

If, when Plaintiff met Mr. White in the elevator of a high-rise apartment, she was as pure as the newly driven snow, then such needs to be established.  If, however, Plaintiff had previously been involved in the sex industry as either an illegal masseuse or as a dancer dancing publicly in a strip club, then Plaintiff was engaged (as per *Dizzy Duck*) in public prostitution and thus can therefore make no claim, for purposes of this motion, that the proceedings in this case under her real name would subject her to disclose information of the "utmost intimacy." For if Plaintiff has indeed been employed in the sex industry *prior* to meeting Mr. White, she has waived any claim of embarrassment or harm from the disclosure of information of the "utmost intimacy."

Therefore, Defendant requests an evidentiary hearing as to the limited issue of whether Plaintiff was ever engaged in the sex industry prior to meeting Mr. White, and thus whether this Court should grant Plaintiff's instant motion.

In order to proceed with Plaintiff's fictitious name, many documents will need to be suppressed and filed under seal.  Defendant submits the entire file should be suppressed and filed under seal, not just those documents or filings which are embarrassing to Plaintiff but rather all of those documents embarrassing and/or detrimental to either party.

Granting Plaintiff's motion would indeed require the suppression of large portions of this case file to be filed under seal, except for the scandalous allegations made by Plaintiff against Dr. Dabbagh.  Thus, the entire file should be suppressed rather then suppressing only those portions to protect only the Plaintiff.

9

**D.**     **Preliminary findings.**

In granting Plaintiff's motion, this Court would be necessarily making a preliminary finding that Plaintiff's allegations are true – thus, if this motion is granted, it should be granted without prejudice subject to reconsideration after discovery proceeds. For if any of Plaintiff's scandalous allegations, standing alone or against Defendant, are false, Plaintiff should be forced to identify herself in her pleadings.

WHEREFORE, for the reasons stated herein, Defendant requests that this Court deny Plaintiff's motion, or, in the alternative, hold an evidentiary hearing on the limited question of Plaintiff's status, if any, in the sex industry **prior** to meeting Mr. White; or, also in the alternative, suppress the entire file *ab initio*, requiring all filings be made under seal.

Respectfully submitted,

STEPHEN M. RYAN, P.L.L.C.

By:_____
     Stephen M. Ryan (P27717)
     Attorney for Defendant
     30700 Telegraph Road, Suite1677
     Bingham Farms, MI  48025
     (248) 723-8500
     (248) 723-8501 (Fax)
     smryanpllc@aol.com

DATED:  April 24, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2015 served Defendant's Response Brief in Opposition to Plaintiff's Motion to Proceed with Pseudonymous Status with this Certificate of Service with the Clerk of the Court using the ECF system which will send notification of such filing to the following:


Nakisha N. Chaney, Esq.
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.
101 N. Main Street, Ste. 558
Ann Arbor, Michigan 48104


*I declare under penalty of perjury that the statement above is true to the best of my information, knowledge and belief.*


Signature _Daphne Chuney_
              Daphne Chuney

11

# EXHIBIT 1

# CURRICULUM VITAE

**Dr. Mamoun Dabbagh, M.D., Psychiatrist**
**28800 Ryan Road, Suite 320**
**Warren, Michigan 48092**
**Office: 586-582-0500 Fax: 586-620-8113**

EDUCATION AND TRAINING:

| | |
|---|---|
| 07/1984- 06/1986 | University of Michigan, Child and Adolescent Psychiatric Hospital, Fellowship in Psychiatry |
| 07/1981- 06/1984 | Wayne State University, Department of Psychiatry Lafayette Clinic, Resident in Psychiatry |
| 1980- 1981 | University of Michigan, Mental Health Research Institute, Research Assistant in Neurobiology of Endorphins |
| 1978- 1979 | Damascus University, Faculty of Medicine, Resident Flexible |
| 1977- 1978 | Damascus University, Faculty of Medicine, Rotating Intern |
| 1972-1978 | Damascus University, Medical School, Damascus, Syria |

WORK HISTORY:

| | |
|---|---|
| 05/2014 – Present | Samaritan Behavioral Center, *Staff Psychiatrist*, Detroit MI. |
| 05/2013 – Present | iPsychiatry, Outpatient Mental Health Clinic *Psychiatrist*, Warren, MI. |
| 02/2013 – 10/2014 | New Oakland, Face to Face Adolescent Program *Staff Psychiatrist, Centerline & Clinton Township,* MI. |
| 10/2010 – Present | Geriatric Psychiatric Services, *Psychiatrist*, Warren, MI. |
| 02/ 2005 – Present | Behavioral Center of Michigan Hospital, *Staff Psychiatrist,* Warren, MI |
| 01/2009 – 10/2010 | Doctors Hospital, Adult Outpatient Psychiatric Services, Pontiac MI. |
| 06/2004 – 12/2008 | Harbor Oaks Hospital - Staff Psychiatrist, New Baltimore, MI. |
| 06/ 2002 – 10/2008 | Advanced Counseling Services, *Staff Psychiatrist,* Taylor, MI. |
| 1993     –     2008 | Havenwyck Hospital - Inpatient Adult and Partial Hospitalization Program *Staff Physician/ Medical Director,* Auburn Hills, MI. |

TEACHING EXPERIENCE:        Lafayette Clinic
                            Resident Training
                            Child Psychiatry

LICENSURE:                  State of Michigan, #4301045473, since October 1982

MEMBERSHIP:                 American Medical Association
                            American Psychiatric Association

PUBLICATIONS:               Lithium: Clinical Use, Toxicology and Mood of Action,
                            Ortiz, A., Dabbagh, M., Gerhon, S., In Bersteom JG (ed):
                            Clinical Psycho –pharmacology ED 2, John Wright PSG
                            1983, pp 111 – 144

                            New Antipsychotic Agents: Clinical Studies, Dabbagh, M.
                            And Davies B (Eds) Elsevier Science Publishers, 1985, pp
                            147 – 161

                            EEG Sleep Physiological and Cholinergic REM Induction
                            Markets in Obsessive Compulsive Disorder (OCD).
                            Kelwala, S., Dabbagh, M. Sitaram, N. (To be published)*

# EXHIBIT 2

For assistance in Pill Identification go to http://www.riteaid.com/pillimage

## Questions? Ask your Rite Aid Pharmacist.



**MEDICATION**
MPHETAMINE SALTS 10 MG TAB

**DIRECTION**
AKE 1 TABLET BY MOUTH TWICE A DAY

**IMPORTANT**
OW TO USE THIS INFORMATION: THIS IS A SUMMARY AND DOES
OT HAVE ALL POSSIBLE INFORMATION ABOUT THIS PRODUCT.
HIS INFORMATION DOES NOT ASSURE THAT THIS PRODUCT IS
AFE, EFFECTIVE, OR APPROPRIATE FOR YOU.
HIS INFORMATION IS NOT INDIVIDUAL MEDICAL ADVICE AND
OES NOT SUBSTITUTE FOR THE ADVICE OF YOUR HEALTH CARE
ROFESSIONAL.
LWAYS ASK YOUR HEALTH CARE PROFESSIONAL FOR
OMPLETE INFORMATION ABOUT THIS PRODUCT AND YOUR
PECIFIC HEALTH NEEDS.
MPHETAMINE/DEXTROAMPHETAMINE – ORAL
m–FET–a–meen/DEX–troe–am–FET–a–meen)

**COMMON BRAND NAME(S)**
dderall

**WARNING**
Misuse or abuse of amphetamine may cause serious (possibly fatal)
eart and blood pressure problems. Amphetamine–type medications can
e habit–forming. Use only as directed. If you use this drug for a long
me, you may become dependent on it and may have withdrawal
ymptoms after stopping the drug. Consult your doctor or pharmacist for
ore details. (See also How to Use section).

**USES**
his combination medication is used to treat attention deficit
yperactivity disorder (ADHD) as part of a total treatment plan, including
sychological, social, and other treatments. It may help to increase the
bility to pay attention, concentrate, stay focused, and stop fidgeting.
his product is a combination of stimulants (amphetamine and
extroamphetamine). It is thought to work by restoring the balance of
ertain natural substances (neurotransmitters) in the brain. This drug may
lso be used to treat a certain sleeping disorder (narcolepsy) to help you
tay awake during the day. It should not be used to treat tiredness or to
old off sleep in people who do not have a sleep disorder.

**HOW TO USE**
ead the Medication Guide provided by your pharmacist before you start
aking amphetamine/dextroamphetamine and each time you get a refill. If
ou have any questions, ask your doctor or pharmacist. Take this
edication by mouth with or without food as directed by your doctor,
sually 1 to 3 times a day. The first dose is usually taken when you
ake up in the morning. If more doses are prescribed, take them as
rected by your doctor, usually 4–6 hours apart. Taking this medication
te in the day may cause trouble sleeping (insomnia). The dosage is
ased on your medical condition and response to treatment. Your doctor
ay adjust your dose to find the dose that is best for you. Follow your
octor's instructions carefully. Use this medication regularly to get the
ost benefit from it. To help you remember, take it at the same time(s)
ach day. During treatment, your doctor may occasionally recommend

stopping the medication for a short time to see whether there are any changes in your
behavior and whether the medication is still needed. This medication may cause withdrawal
reactions, especially if it has been used regularly for a long time or in high doses. In such
cases, withdrawal symptoms (including severe tiredness, sleep problems, mental/mood
changes such as depression) may occur if you suddenly stop using this medication. To
prevent withdrawal reactions, your doctor may reduce your dose gradually. Consult your
doctor or pharmacist for more details, and report any withdrawal reactions immediately. Along
with its benefits, this medication may rarely cause abnormal drug–seeking behavior
(addiction). This risk may be increased if you have abused alcohol or drugs in the past. Take
this medication exactly as prescribed to lessen the risk of addiction. Do not increase your
dose or use this drug more often or for longer than prescribed. Properly stop this medication
when so directed. When this medication is used for a long time, it may not work as well. Talk
with your doctor if this medication stops working well. Tell your doctor if your condition does
not improve or if it worsens.

**SIDE EFFECTS**
Loss of appetite, weight loss, dry mouth, stomach upset/pain, nausea/vomiting, dizziness,
headache, diarrhea, fever, nervousness, and trouble sleeping may occur. If any of these
effects persist or worsen, tell your doctor promptly. Remember that your doctor has
prescribed this medication because he or she has judged that the benefit to you is greater
than the risk of side effects. Many people using this medication do not have serious side
effects. This medication may raise your blood pressure. Check your blood pressure regularly
and tell your doctor of any high results. Tell your doctor right away if you have any serious
side effects, including: mental/mood/behavior changes (such as agitation, aggression, mood
swings, depression, abnormal thoughts), uncontrolled movements, continuous chewing
movements/teeth grinding, outbursts of words/sounds, change in sexual ability/desire. Get
medical help right away if you have any very serious side effects, including: shortness of
breath, chest/jaw/left arm pain, fainting, severe headache, fast/pounding/irregular heartbeat,
seizures, swelling of the ankles/feet, extreme tiredness, blurred vision, weakness on one side
of the body, slurred speech, confusion. A very serious allergic reaction to this drug is rare.
However, get medical help right away if you notice any symptoms of a serious allergic
reaction, including: rash, itching/swelling (especially of the face/tongue/throat), severe
dizziness, trouble breathing. This is not a complete list of possible side effects. If you notice
other effects not listed above, contact your doctor or pharmacist. In the US – Call your
doctor for medical advice about side effects. You may report side effects to FDA at
1–800–FDA–1088. In Canada – Call your doctor for medical advice about side effects. You
may report side effects to Health Canada at 1–866–234–2345.

**PRECAUTIONS**
Before taking this medication, tell your doctor or pharmacist if you are allergic to it; or to
sympathomimetic drugs (such as epinephrine, pseudoephedrine); or if you have any other
allergies. This product may contain inactive ingredients, which can cause allergic reactions or
other problems. Talk to your pharmacist for more details. Before using this medication, tell
your doctor or pharmacist your medical history, especially of: certain mental/mood conditions
(such as severe agitation, psychosis), personal/family history of mental/mood disorders
(such as bipolar disorder, depression, psychotic disorder, suicidal thoughts), heart problems
(including irregular heartbeat/rhythm, coronary artery disease, heart failure, cardiomyopathy,
problems with the heart structure such as valve problems), family history of heart problems
(such as sudden death/irregular heartbeat/rhythm), history of stroke, high blood pressure,
overactive thyroid (hyperthyroidism), a certain eye problem (glaucoma), seizures, personal or
family history of regular use/abuse of drugs/alcohol, personal or family history of
uncontrolled muscle movements (such as Tourette's syndrome), kidney disease, liver
disease. This drug may make you dizzy. Do not drive, use machinery, or do any activity that
requires alertness until you are sure you can perform such activities safely. Limit alcoholic



RITE AID–5520 DRAKE RD                    (248) 661–0774
5520 DRAKE ROAD                    Store DEA: BA3397444
WEST BLOOMFIELD MI 48322                    RPH: AR4

Rx 04399 0808018                    Date Filled: 03/26/2015

5000 CIVIC CENTER DR, SUITE 2604
SOUTHFIELD, MI 48075

AMPHETAMINE SALTS 10 MG TAB             DAW: 0
NDC: 00555–0972–02     QTY: 60     DAYS SUPPLY: 30

DABBAGH, MAMOUN MD



**MEDICATION WARNINGS**

| | |
|---|---|
| WARNING: READ ATTENTIVELY THE RECOMMENDED DOSE WHEN USING THIS DRUG. CONSULT YOUR DOCTOR OR PHARMACIST | READ THE FDA BLACK BOX WARNING INFORMATION FOR THIS MEDICATION |
| MAY CAUSE DIZZINESS | READ THE MEDICATION GUIDE THAT COMES WITH THIS MEDICINE |
| THIS DRUG MAY IMPAIR THE ABILITY TO DRIVE OR OPERATE MACHINERY. USE CARE UNTIL YOU BECOME FAMILIAR WITH ITS EFFECTS | |
| THIS MEDICINE MAY BE TAKEN WITH OR WITHOUT FOOD | |
| OBTAIN MEDICAL ADVICE BEFORE TAKING NON-PRESCRIPTION DRUGS AS SOME MAY AFFECT THE ACTION OF THIS MEDICATION | |

**Rite ADVICE™**

You can refill your prescription when it's convenient for you. **Refills by Phone.** Call the number on your
prescription bottle and follow the automated instructions. **Easy Refills Online.** Order online at riteaid.com

PAGE 1 OF 2

ORDER NO. 461483

For assistance in Pill Identification go to http://www.riteaid.com/pillimage

## Questions? Ask your Rite Aid Pharmacist. 

RITE AID–5520 DRAKE RD          (248) 661–0774
5520 DRAKE ROAD                 Store #04A–BA3367A4
WEST BLOOMFIELD, MI 48322       RPH #RP1

Rx 04399 0808017               Date Filled: 03/26/2013

5000 CIVIC CENTER DR, SUITE 2604
SOUTHFIELD, MI 48075

CITALOPRAM HBR 10 MG TABLET          DAW: 0
NDC: 31722–0206–01    QTY: 30    DAYS SUPPLY: 30

DABBAGH, MAMOUN MD

**EDICATION**
TALOPRAM HBR 10 MG TABLET

**RECTION**
AKE 1 TABLET BY MOUTH AT BEDTIME

**IPORTANT**
OW TO USE THIS INFORMATION: THIS IS A SUMMARY AND DOES OT HAVE ALL POSSIBLE INFORMATION ABOUT THIS PRODUCT. HIS INFORMATION DOES NOT ASSURE THAT THIS PRODUCT IS AFE, EFFECTIVE, OR APPROPRIATE FOR YOU. HIS INFORMATION IS NOT INDIVIDUAL MEDICAL ADVICE AND OES NOT SUBSTITUTE FOR THE ADVICE OF YOUR HEALTH CARE ROFESSIONAL. LWAYS ASK YOUR HEALTH CARE PROFESSIONAL FOR OMPLETE INFORMATION ABOUT THIS PRODUCT AND YOUR PECIFIC HEALTH NEEDS. TALOPRAM – ORAL (sye–TAL–oh–pram)

**OMMON BRAND NAME(S)**
elexa

**ARNING**
ntidepressant medications are used to treat a variety of conditions, cluding depression and other mental/mood disorders. These medications n help prevent suicidal thoughts/attempts and provide other important enefits. However, studies have shown that a small number of people specially people younger than 25) who take antidepressants for any ndition may experience worsening depression, other mental/mood mptoms, or suicidal thoughts/attempts. Therefore, it is very important talk with the doctor about the risks and benefits of antidepressant edication (especially for people younger than 25), even if treatment is t for a mental/mood condition. Tell the doctor immediately if you notice orsening depression/other psychiatric conditions, unusual behavior anges (including possible suicidal thoughts/attempts), or other ental/mood changes (including new/worsening anxiety, panic attacks, ouble sleeping, irritability, hostile/angry feelings, impulsive actions, vere restlessness, very rapid speech). Be especially watchful for ese symptoms when a new antidepressant is started or when the dose changed.

**SES**
talopram is used to treat depression. It may improve your energy level d feelings of well–being. Citalopram is known as a selective serotonin uptake inhibitor (SSRI). This medication works by helping to restore the lance of a certain natural substance (serotonin) in the brain.

**THER USES**
is section contains uses of this drug that are not listed in the approved ofessional labeling for the drug but that may be prescribed by your alth care professional. Use this drug for a condition that is listed in this ction only if it has been so prescribed by your health care ofessional. This medication may also be used to treat other mental nditions (such as obsessive–compulsive disorder, panic disorder).

**OW TO USE**
ead the Medication Guide and, if available, the Patient Information

Leaflet provided by your pharmacist before you start taking citalopram and each time you get a refill. If you have any questions, ask your doctor or pharmacist. Take this medication with or without food as directed by your doctor, usually once daily in the morning or evening. The dosage is based on your medical condition, response to treatment, age, laboratory tests, and other medications you may be taking. Be sure to tell your doctor and pharmacist about all the products you use (including prescription drugs, nonprescription drugs, and herbal products). The maximum dosage for citalopram is 40 milligrams per day. If you are using the liquid form of this medication, carefully measure the dose using a special measuring device/spoon. Do not use a household spoon because you may not get the correct dose. To reduce your risk of side effects, your doctor may direct you to start taking this drug at a low dose and gradually increase your dose. Follow your doctor's instructions carefully. Do not increase your dose or use this drug more often or for longer than prescribed. Your condition will not improve any faster, and your risk of side effects will increase. Take this medication regularly to get the most benefit from it. To help you remember, take it at the same time each day. It is important to continue taking this medication even if you feel well. Do not stop taking this medication without consulting your doctor. Some conditions may become worse when this drug is suddenly stopped. Also, you may experience symptoms such as mood swings, headache, tiredness, sleep changes, and brief feelings similar to electric shock. To prevent these symptoms while you are stopping treatment with this drug, your doctor may reduce your dose gradually. Consult your doctor or pharmacist for more details. Report any new or worsening symptoms immediately. It may take 1 to 4 weeks to feel a benefit from this drug and up to several weeks before you get the full benefit. Tell your doctor if your condition does not improve or if it worsens.

**SIDE EFFECTS**
See also Warning and Precautions sections. Nausea, dry mouth, loss of appetite, tiredness, drowsiness, sweating, blurred vision, and yawning may occur. If any of these effects persist or worsen, tell your doctor or pharmacist promptly. Remember that your doctor has prescribed this medication because he or she has judged that the benefit to you is greater than the risk of side effects. Many people using this medication do not have serious side effects. Tell your doctor right away if you have any serious side effects, including: shaking (tremor), decreased interest in sex, changes in sexual ability, easy bruising/bleeding. Get medical help right away if you have any very serious side effects, including: fainting, fast/irregular heartbeat, black stools, vomit that looks like coffee grounds, seizures. This medication may increase serotonin and rarely cause a very serious condition called serotonin syndrome/toxicity. The risk increases if you are also taking other drugs that increase serotonin, so tell your doctor or pharmacist of all the drugs you take (see Drug Interactions section). Get medical help right away if you develop some of the following symptoms: fast heartbeat, hallucinations, loss of coordination, severe dizziness, severe nausea/vomiting/diarrhea, twitching muscles, unexplained fever, unusual agitation/restlessness. Rarely, males may have a painful or prolonged erection lasting 4 or more hours. If this occurs, stop using this drug and get medical help right away, or permanent problems could occur. A very serious allergic reaction to this drug is rare. However, get medical help right away if you notice any symptoms of a serious allergic reaction, including: rash, itching/swelling (especially of the face/tongue/throat), severe dizziness, trouble breathing. This is not a complete list of possible side effects. If you notice other effects not listed above, contact your doctor or pharmacist. In the US – Call your doctor for medical advice about side effects. You may report side effects to FDA at 1–800–FDA–1088. In Canada – Call your doctor for medical advice about side effects. You may report side effects to Health Canada at 1–866–234–2345.

**PRECAUTIONS**
Before taking citalopram, tell your doctor or pharmacist if you are allergic to it; or to escitalopram; or if you have any other allergies. This product may contain inactive







## Rite ADVICE™

You can refill your prescription any time it's convenient for you. **Refills by Phone.** Call the number on your prescription bottle and follow the automated instructions. **Easy Refills Online.** Order online at riteaid.com.
Call your doctor for medical advice about side effects. You may report side effects to FDA at 1–800–FDA–1088.

PAGE 1 OF 2

ORDER NO. 461483

MEDICATION WARNINGS

