# EXHIBIT C

MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
1–4

### Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF MICHIGAN
 3              SOUTHERN DIVISION
 4
 5   JANE DOE, an individual Michigan
 6   Resident filing anonymously under
 7   A fictitious name,
 8         Plaintiff,
 9   vs.                    Case No. 2:15-cv-10724
10   MAMOUN DABBAGH, M.D.,   Hon. Stephen J. Murphy III
11         Defendant.        Mag. Elizabeth A. Stafford
12   _____/
13
14   DEPONENT:   Mamoun Dabbagh, M.D.
15   DATE:       February 18, 2016
16   TIME:       1:08 p.m.
17   LOCATION:   21 Kercheval Avenue, Suite 363
18               Grosse Pointe Farms, MI
19
20   REPORTER:   Kathryn M. DeKresz, CSR 1351
```

### Page 2

```
 1   APPEARANCES:
 2     NAKISHA N. CHANEY (P65066)
 3     Nacht, Roumel & Salvatore, PC
 4     101 N. Main Street, Suite 555
 5     Ann Arbor, MI 48104
 6     (734) 663-7550
 7     nchaney@nachtlaw.com
 8         Appearing on behalf of Plaintiff.
 9
10     DAVID GRIEM (P23187)
11     David Griem & Associates
12     21 Kercheval Avenue, Suite 363
13     Grosse Pointe Farms, MI 48236
14     (313) 962-8600
15     davidgriemlaw@gmail.com
16         Appearing on behalf of Defendant.
17
18     STEPHEN M. RYAN (P27717)
19     Stephen M. Ryan, PLLC
20     30700 Telegraph Road, Suite 1677
21     Bingham Farms, MI 48025
22     (248) 723-8500
23     smryanpllc@aol.com
24         Appearing on behalf of Defendant.
```

### Page 3

```
 1                   I N D E X
 2   WITNESS                                    PAGE
 3           Mamoun Dabbagh, MD
 4           Examination by Ms. Chaney              4
 5
 6
 7
 8                   E X H I B I T S
 9   EXHIBIT                                    PAGE
10   Exhibit Number 1 - Text Message Excerpts     39
11   Exhibit Number 2 - Answers to Interrogatories 50
12   Exhibit Number 3 - Answers to Requests to Admit 54
13
14
15           (Exhibits attached.)
```

### Page 4

```
 1              Grosse Pointe Farms, Michigan
 2              February 18, 2016
 3              1:08 p.m.
 4                    - - -
 5         MAMOUN DABBAGH, MD,
 6   having been first duly sworn, was examined and
 7   testified as follows:
 8              EXAMINATION
 9   BY MS. CHANEY:
10   Q   Dr. Dabbagh, my name is Nakisha Chaney. I represent the
11       plaintiff in this case. I am going to ask you a series
12       of questions. You have an attorney present here if an
13       objection needs to be made or an instruction not to
14       answer a question.
15           If you could, could you please state your full
16       name for the record?
17   A   It's Mamoun Dabbagh. My first name is Mamoun,
18       M-A-M-O-U-N, last name Dabbagh, D-A-B-B-A-G-H.
19   Q   Dr. Dabbagh, where do you currently reside?
20   A   It's 5000 Town Center, Unit 2004, and it's Southfield,
21       Michigan, 48075.
22   Q   Have you taken any medications or do you suffer any
23       ailments that may affect your memory or your ability to
24       understand my questions?
25   A   No.
```



MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
5–8

Page 5

1  Q  Have you had your deposition taken before?
2  A  Yes.
3  Q  How many times?
4  A  I wouldn't be able to count how many times, so it's
5     multiple times.
6  Q  More than five?
7  A  Yes.
8  Q  More than 10?
9  A  Yes.
10 Q  Okay. More than 20?
11 A  Probably.
12 Q  More than 30?
13 A  I wouldn't know.
14 Q  And in all those cases were you -- or in any of those
15    cases were you a defendant?
16 A  Yes.
17 Q  And all of them or just some of them?
18 A  Some of them.
19 Q  Approximately how many of them?
20 A  Four.
21 Q  And in those -- what kinds of cases were those? were
22    they criminal or civil cases?
23 A  Civil cases.
24 Q  Were they malpractice or some other type of claim?
25 A  Combination.

Page 6

1  Q  So other than malpractice, what other claims?
2  A  It's related to an issue about financial issue or
3     business issue.
4  Q  How many of the four cases were malpractice cases?
5  A  Three.
6  Q  Just very, very generally what was the nature of the
7     financial issue?
8  A  In one situation I signed for collateral for buying
9     equipment for a friend of mine and he defaulted on his
10    equipment, so they sued me for that.
11        MR. GRIEM: There's a message there.
12        MS. CHANEY: And what message is that?
13        MR. GRIEM: No good deed goes unpunished.
14 BY MS. CHANEY:
15 Q  For the three malpractice cases, I would like to take
16    one each in turn if you will. For the first one, when
17    did that occur?
18        MR. GRIEM: Doctor, if I might. All of those
19    matters have been resolved?
20        THE WITNESS: Yes.
21        MR. GRIEM: None of them are pending?
22        THE WITNESS: No.
23        MR. GRIEM: Okay.
24 BY MS. CHANEY:
25 Q  When was the first one?

Page 7

1  A  I think the first time was probably about 25 years ago.
2  Q  Was that here in Michigan?
3  A  Yes.
4  Q  And what was claimed?
5  A  The claim, one of the patients has died from heart
6     attack, so I was sued and my partner -- it was not my
7     patient, it was my partner's patient, but I was covering
8     for this when I was on call when he was out of town, my
9     partner.
10 Q  Were you personally accused of any wrongdoing in that
11    case?
12 A  They accused everyone for wrongdoing for that case.
13 Q  But for you specifically, what did they say you did
14    wrong?
15 A  That I did not advise the wife to go to the emergency
16    room for her husband.
17 Q  Were you acting as a psychiatrist at the time?
18 A  Yes.
19 Q  What was the plaintiff's name in that case?
20 A  I can't remember.
21 Q  Do you remember the patient's last name?
22 A  No.
23 Q  How did that case resolve?
24 A  Basically it was mitigation suggested certain amount of
25    money and they agreed for a certain amount of money

Page 8

1     to resolve it.
2  Q  Tell me a little bit about the second case of
3     malpractice.
4  A  Second case about a patient who was hospitalized and he
5     was discharged and he went to a convenience store to buy
6     cigarettes and he was hit by a car, a cab, and the cab
7     driver, his --
8        REPORTER: I'm sorry? Cab driver and --
9        THE WITNESS: Group home.
10 BY MS. CHANEY:
11 Q  I'm sorry. His what?
12 A  Group home.
13 Q  Group home. Okay.
14 A  All right. He was residing in a group home and the
15    hospital and myself were sued.
16 Q  Were you accused personally of wrongdoing in that case?
17 A  Yes.
18 Q  What did they accuse you of?
19 A  That I discharged the patient too early from the
20    hospital.
21 Q  Do you remember the patient's last name?
22 A  I don't.
23 Q  Was that patient killed?
24 A  No.
25 Q  And how did that case resolve?



800.211.DEPO (3376)
EsquireSolutions.com

2:15-cv-10724-SJM-EAS Doc # 26-4 Filed 07/25/16 Pg 4 of 20 Pg ID 369

MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
9–12

### Page 9

1. A  The patient had no persistent injuries, so it was
2.    resolved by settling for $20,000.
3. Q  Was that just your portion of the settlement or the
4.    whole settlement?
5. A  Just -- I think the cab driver was settled for 5,000.
6. Q  What was your portion of the settlement in the first
7.    case, the patient that died from the heart attack?
8. A  60,000.
9. Q  Did that second case take place in Michigan as well?
10. A  Yes.
11. Q  When was that, what year approximately?
12. A  Almost 20 years ago.
13. Q  What about the third malpractice case?
14. A  The third case was about a patient who was also a friend
15.    of mine who I treated previously, but he committed
16.    suicide. And at that time I was not his psychiatrist,
17.    but I helped him with refilling his medication because
18.    his physician refused to refill his medication. So the
19.    family accused me that I was responsible about that in
20.    spite he has his own psychiatrist.
21. Q  What kind of medication were you prescribing him?
22. A  Basically antidepressant medication.
23. Q  Antidepressant?
24. A  Yes.
25. Q  But he was not your patient?

### Page 10

1. A  No. Not at that time, no.
2. Q  At the time that you were prescribing him the
3.    medications would you say that you had a
4.    physician-patient relationship with him?
5. A  It was a bridge relationship, when you bridge somebody
6.    until they go to their physician for treatment.
7. Q  What was that patient's name?
8. A  Mark Hyash [phon.].
9. Q  And how did that case resolve?
10. A  It also was settled for $20,000. Also his counseling
11.    entity was also sued for that. He was going through
12.    counseling and seeing a psychiatrist at that place.
13. Q  Have you been sued for malpractice in any other
14.    instances?
15. A  No.
16. Q  Have you ever been sued in a case involving a woman who
17.    was your patient who claimed that she was getting drugs
18.    or prescriptions from you and she later tried to commit
19.    suicide?
20. A  No.
21. Q  You can't think of any other instances -- let me ask you
22.    this. Have you been sued in any other instances other
23.    than the four that we've talked about?
24. A  I think there is one case and it was dropped. The
25.    lawsuit was a patient at Havenwyck Hospital. He also

### Page 11

1.    was not my patient. I was covering for his physician.
2.    And so they were suing everyone who has name on the
3.    chart, including myself.
4. Q  Were you personally accused of any wrongdoing in that
5.    case?
6. A  I don't remember if I was personally accused of any
7.    wrongdoing.
8. Q  Was that in Michigan?
9. A  Yes.
10. Q  Did the case -- how did the case resolve?
11. A  I think the hospital paid 60,000 and the other physician
12.    went to court and he was found not guilty of
13.    malpractice.
14. Q  Can you think of any other instances that you have been
15.    sued?
16. A  There's an instance, but I was not sued, the hospital
17.    was sued and I was mainly a witness or I was deposed for
18.    that.
19. Q  Were you accused of any personal wrongdoing in those
20.    cases?
21. A  No.
22. Q  Have you at any time as a psychiatrist ever had sexual
23.    relations with a person who was a patient of yours?
24. A  No.
25. Q  Since you have had your deposition taken a number of

### Page 12

1.    times, just very briefly, we have a court reporter here.
2.    She's going to take down all of the questions and
3.    answers that are provided. Allow me to complete the
4.    question before you give your answer and in turn I will
5.    allow you to complete your answer before I move to the
6.    next question. If for some reason I've cut you off or
7.    you feel like you need to complete your answer, just let
8.    me know. Also if you feel like you need to go back and
9.    clarify an answer previously given, then let me know.
10.    If at any time I ask a question and you don't understand
11.    it, just let me know so that I can clarify that for you.
12.    Okay?
13. A  Okay.
14. Q  If you need a break at any time just let me know, I'll
15.    be happy to give you one. If there is a question or a
16.    short line of questions that are pending, then I may
17.    want to complete that before we take a break. Okay?
18. A  Okay.
19. Q  Do you have any questions before we move forward?
20. A  No.
21. Q  Are you married?
22. A  No.
23. Q  Have you ever been married?
24. A  Yes.
25. Q  How many times?

2:15-cv-10724-SJM-EAS   Doc # 26-4   Filed 07/25/16   Pg 5 of 20   Pg ID 370

MAMOUN DABBAGH M.D.  
JANE DOE vs. DABBAGH

February 18, 2016  
13–16

Page 13

1 A One.
2 Q What years were you married?
3 A '82 to '95.
4 Q What was your wife's name?
5 A Eleanor Medina.
6 Q Is she here in the US?
7 A Yes.
8 Q Does she reside in Michigan?
9 A Yes.
10 Q Do you have any children?
11 A No.
12 Q Have you ever lived with anyone other than your wife?
13 A No.
14 Q Like as a partner?
15 A No.
16 Q What was your address in 2013?
17 A The same.
18 Q 5000 Town Center?
19 A Yes. I may have been in another unit, which is 2503.
20   Yeah, 2503.
21 Q Why did you switch units?
22 A I just left my unit to go and just move to this unit. I
23   am renting it currently.
24 Q So you were owning the previous unit?
25 A Correct.

Page 14

1 Q So you owned 2503 and then you said you let it go. What
2   does that mean, you sold it or --
3 A We were trying negotiate with the bank with changing the
4   mortgage, but for whatever reason the bank did not
5   comply and I was advised to let it go.
6 Q So did they foreclose on the unit?
7 A Yes.
8 Q And you rented a different unit --
9 A Correct.
10 Q -- in that building? Are you still renting or do you
11   own it?
12 A Renting.
13 Q Is anyone living with you at that property?
14 A No.
15 Q From 2013 through the present, other than the condo you
16   told me about that was foreclosed on and the current one
17   that you're renting, have you owned any other
18   properties?
19 A No.
20 Q Have you rented or leased any other properties?
21 A No.
22 Q Do you control any property or possess any property
23   that's in someone else's name but that you control?
24 A No.
25 Q Have you ever been arrested?

Page 15

1 A Yes.
2 Q How many times?
3 A Two.
4 Q When was the first time?
5 A I will have a hard time remembering when.
6 Q Was it a year ago?
7 A No. Probably 20 years ago.
8 Q 20 years ago? Was that here in Michigan?
9 A Yes.
10 Q What was it for?
11 A It's the business I mentioned to you, they didn't pay
12   the tax and they issued citation for not paying city tax
13   for all the people who contribute in the business. And
14   I was not aware of the citation so they have warrant
15   against my arrest. And I was stopped by the police and
16   I was not aware of the warrant.
17 Q What was the name of the business?
18 A It was Jet's Pizza.
19 Q Jet's Pizza. So you had an ownership interest in a
20   Jet's Pizza?
21 A Yes.
22 Q What was the charge, tax evasion?
23 A No. It was not paying tax.
24 Q And that was state or city taxes?
25 A City taxes.

Page 16

1 Q City tax. Okay. How did that resolve?
2 A At that time there's -- I believe there is really no tax
3   but they was just issuing tax because the manager didn't
4   know that he has to file for tax for the city. So I was
5   not part of the business. I just put some money in it
6   but my name was on it.
7 Q Were you ever convicted in that case?
8 A No.
9 Q Were the charges dismissed?
10 A Yes.
11 Q What was the second arrest?
12 A The second one was for a DUI.
13 Q When was that?
14   MR. GRIEM: You know what? I'm going to jump
15   in at this point in time. That case is pending. I will
16   confirm that it was a driving under the influence case,
17   and it is pending in Southfield District Court. I'm not
18   going to allow him to answer any questions regarding a
19   pending criminal matter.
20   MS. CHANEY: Fair enough.
21 BY MS. CHANEY:
22 Q Were there any other charges other than DUI associated
23   with that?
24 A No.
25 Q Have you ever had any convictions?

MAMOUN DABBAGH M.D.  
JANE DOE vs. DABBAGH

February 18, 2016  
17–20

Page 17

1  A   No.
2  Q   Have you ever pled guilty to any crimes?
3  A   No.
4  Q   Or no contest?
5  A   No.
6  Q   To your knowledge have you ever been the subject of a
7      criminal investigation?
8          MR. GRIEM: Let me help. Sometimes it's the
9      terminology, but he is the subject of a current federal
10     criminal investigation which I think I made you aware of
11     in a letter dated February 5th of 2016.
12 BY MS. CHANEY:
13 Q   Yes, sir. And I understand you've got some Fifth
14     Amendment rights that you want to make sure to protect
15     you, your attorney will assert at the right time. The
16     criminal investigation that your attorney just
17     mentioned, do you know the nature of that
18     investigation, what they are looking at?
19         MR. GRIEM: You know what --
20         THE WITNESS: On the advice of my attorney I
21     assert my Fifth Amendment privilege.
22         MS. CHANEY: Okay. Even with regard to the
23     subject of the investigation? Because I'm not asking
24     him about whether he did anything or didn't do anything.
25     I'm just asking what is the nature of the investigation.

Page 18

1          MR. GRIEM: And I'm not sure that he knows
2      except through conversations with me. He's not appeared
3      in court on that matter, so he has not been given any
4      formal notice, and anything that -- any knowledge he has
5      of the case is through me and I think we've got an
6      attorney-client privilege there.
7          MS. CHANEY: Okay. So I will just ask the
8      questions I think I need to ask and you just assert what
9      you need to assert and we'll be okay.
10         MR. GRIEM: All right.
11 BY MS. CHANEY:
12 Q   So do you know if that investigation concerns an
13     allegation of you selling prescriptions?
14 A   On the advice of my attorney I assert my Fifth Amendment
15     privilege.
16 Q   Okay. Do you know if that investigation concerns you
17     being involved in a human trafficking scheme?
18 A   On the advice of my attorney I assert my Fifth Amendment
19     privileges.
20 Q   Other than the investigation we have been talking about,
21     are you aware of any other criminal investigations that
22     have been done of you?
23 A   No.
24 Q   Have you ever been the subject of any subpoenas?
25 A   No.

Page 19

1          (Discussion off the record;
2           Stephen Ryan enters room.)
3  BY MS. CHANEY:
4  Q   Dr. Dabbagh, have you ever been the subject of any
5      search warrants?
6  A   Yes.
7  Q   How many?
8  A   I think one or two.
9  Q   For the one that you are certain about, when did that
10     occur?
11 A   2014.
12 Q   Who served that warrant?
13 A   I don't know. Like what do you mean who served it?
14 Q   Was it the state police or was it the FBI or DEA or
15     what law enforcement agency?
16 A   It was multiple law enforcement at that time.
17 Q   Of the people that you recall, what agencies were
18     represented?
19 A   The DEA and the state police if I recall.
20 Q   Where did they serve that search warrant?
21 A   At my office.
22 Q   Where is that office located?
23 A   It's 28800 Ryan Road, Warren, Michigan. It's in Warren,
24     Michigan.
25 Q   Does your office have a name or your business have a

Page 20

1      name?
2  A   It's really not my business. I just work there. It's
3      called Eye Psychiatry [sic].
4  Q   You said it's not your business. Whose business is it,
5      if you know?
6  A   It's still designed as a nonprofit organization and used
7      to be owned by the hospital, after that owned by an
8      organization who does geriatric program and still it has
9      its own entity.
10 Q   And was law enforcement serving the search warrant to
11     your knowledge on the entirety of that organization or
12     just you and your office?
13 A   I can't be clear about who was exactly served.
14 Q   Did they tell you anything about why they were serving
15     you with a search warrant?
16 A   No.
17 Q   And what did they take from the search warrant?
18 A   Multiple charts.
19 Q   Patient charts?
20 A   Yes.
21 Q   Anything else?
22 A   I think they took a computer also.
23 Q   They took your computer?
24 A   Not my computer. It's a clinic computer.
25 Q   Was it in your office?

MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
21–24

**Page 21**

1  A  No. I don't have an office there.
2  Q  What else did they take?
3  A  I wouldn't know.
4  Q  Did they ask you any questions at that time?
5  A  They did.
6  Q  What did they ask you?
7  A  I wouldn't answer any questions until I talked to my
8     attorney.
9  Q  But what did they ask you?
10 A  They didn't ask any questions. Myself, they didn't ask
11    me any questions.
12 Q  So they did not ask you any questions?
13 A  No.
14 Q  So I'm not asking if you answered questions. I'm asking
15    did they ask you any questions?
16 A  Not at the time of this search, no.
17 Q  Did they ask you questions at any time?
18 A  No.
19 Q  Was there ever a search warrant served anywhere else on
20    you?
21 A  For my condo also.
22 Q  What unit was that?
23 A  2004.
24 Q  What law enforcement agency was involved in that?
25 A  I was not there.

**Page 22**

1  Q  Do you know what year that occurred?
2  A  What?
3  Q  What year?
4  A  It's the same. 2014.
5  Q  Did that happen around the same time to your knowledge?
6  A  Yes. The same day.
7  Q  What did they take from your condo?
8  A  Multiple pieces of art.
9  Q  They took art?
10 A  Yeah.
11 Q  Anything else?
12 A  I don't know what they took. That's really what I know
13    what they take. They take a lot of paperwork I have in
14    my house.
15 Q  What kind of paperwork?
16 A  Paperwork has to do with -- I can't tell you the
17    paperwork, but whatever they take, I didn't really look
18    at what they take.
19 Q  Was it financial paperwork, like bank statements?
20 A  Probably did. I can't -- I don't know.
21 Q  Probably did or probably didn't?
22 A  Probably did it.
23 Q  Did it?
24 A  Yes.
25 Q  As in yes?

**Page 23**

1  A  Yes.
2  Q  Did they take any patient documents or records from your
3     condo?
4  A  There's no records, but there is some prescription,
5     background of prescription. They took that also.
6  Q  They took prescription pads?
7  A  I really don't know if they took pads or not.
8  Q  So can you explain to me what -- you just mentioned that
9     they took prescription something. What was that?
10 A  Sometimes I have prescription pad and when I write
11    prescription there is a pad behind it and sometimes I
12    just leave it at the house and they took some of it,
13    yes.
14 Q  So when you write a prescription there's like a carbon
15    copy?
16 A  Correct.
17 Q  You had carbon copies of prescriptions?
18 A  Correct.
19 Q  You think they took those as well?
20 A  Yeah.
21 Q  What kind of medications would those prescriptions have
22    been for?
23 A  I wouldn't really -- can't tell you what type of
24    medications. It was multiple medications, whatever
25    medication I prescribed to people.

**Page 24**

1  Q  Would that include Adderall?
2  A  I can't answer that question.
3  Q  Because you don't know?
4  A  Does that include Adderall? I wouldn't know.
5  Q  Do you prescribe or did you at that time prescribe
6     Adderall?
7  A  I always prescribe Adderall for the last 30 years.
8  Q  30 years? Okay. Did they take anything else from your
9     home other than art and paperwork?
10 A  I think that's mainly what they took.
11 Q  Did they take any computers or phones?
12 A  I have no computer.
13 Q  Did they take any phones?
14 A  I think they might. I think they took some of my old
15    phones, yes.
16 Q  Did they take any tablets? And when I say tablets I
17    mean like iPhone or iPad.
18 A  No tablets.
19 Q  Okay. Did they take any cash?
20 A  No.
21 Q  Did they take cash from your office at work or your
22    workplace?
23 A  Yes, they did.
24 Q  How much in cash did they take?
25 A  I think around eleven or twelve thousand.



MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
25–28

Page 25

1 Q Was that your cash?
2 A No.
3 Q Whose cash was it?
4 A It's the clinic's cash.
5 Q Can you think of anything else they took from your home
6  or your workplace?
7 A No -- some of my IDs they took also.
8 Q IDs, like what IDs?
9 A Like federal IDs.
10 Q Passport?
11 A No, I don't have a passport.
12 Q Can you tell me the IDs that they took?
13 A Like my green card.
14 Q Anything else?
15 A No. I don't think anything else.
16 Q Do you know why they took those things?
17 A No idea.
18 Q Do you know if those items are currently subject to a
19  forfeiture proceeding?
20 A The art, yes, I know.
21 Q Do you know if they are claiming that the art are
22  proceeds of criminal activity?
23 A Yes.
24 Q What criminal activity is alleged?
25 A As I said, I'm still not sure what's the allegation at

Page 26

1  this time.
2 Q Okay. Has anyone other than an attorney told you that
3  the government is investigating selling prescription
4  medications or prescriptions?
5 A No.
6 Q Has anyone told you that the government is investigating
7  involvement in human trafficking other than an attorney?
8 A I'm not aware of that, no.
9 Q Have you talked to anyone other than your attorney with
10  regard to the investigation?
11 A No.
12 Q Have you talked to anyone other than an attorney with
13  regard to the search warrant?
14 A No.
15 Q Have you been interviewed by any criminal or any law
16  enforcement agency?
17 A No.
18 Q Other than a driver's license, do you have any license
19  that's issued by any governmental entity?
20 A No.
21 Q A license to practice medicine?
22 A Oh, that's -- yes.
23 Q How long have you been licensed to practice medicine in
24  Michigan?
25 A Since 1981.

Page 27

1 Q Has there been any interruption in your license?
2 A No.
3 Q Is that license currently active?
4 A Yes.
5 Q To your knowledge have there been any licensing
6  investigations?
7 A Not currently, no, not to my knowledge.
8 Q At any time?
9 A There's always a complaint from a patient and you get an
10  investigation, so there's a previous one.
11 Q How many are you aware of?
12 A It may be two or three.
13 Q Can you tell me about the first one that you are aware
14  of? When did that occur, the patient complaint?
15 A The first patient complaint was the patient's family
16  complained that I didn't call them back or I didn't have
17  communication with them at the hospital, and that was --
18  I'm aware of that. And it was resolved without any
19  issue.
20 Q When did that occur?
21 A 20 years ago also.
22 Q 20 years. Okay. Was there any licensing action as a
23  result of that?
24 A No.
25 Q What about the second one?

Page 28

1 A The second one was about the patient who -- I was out of
2  town and he was given medication by the physician who
3  covered for me, who -- he got sedated. But I think the
4  complaint was not from the patient or family, but was
5  from -- I can't -- I wouldn't know who complained and
6  that is another complaint.
7 Q When did that happen?
8 A That is about 15 -- probably 1904.
9 Q 19 --
10 A 2004.
11 Q 2004. Okay. Was there any licensing action as a result
12  of that?
13 A There was no licensing action. I had a citation for
14  that and fine for 2,000.
15 Q For $2,000?
16 A Mm-hmm.
17 Q Was there a consent agreement with the state for that?
18 A I don't know what you mean by consent agreement.
19 Q Did you and the state agree that you'd pay a certain
20  fine to resolve the matter?
21 A You could say that. I'm not sure if this is --
22 Q Did the state find you negligent in that action?
23 A I don't know if they find negligent or -- I'm not sure
24  what's the finding.
25 Q Did they find that you violated any statute or ethical



800.211.DEPO (3376)
EsquireSolutions.com

MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
29–32

**Page 29**

1 principle or anything like that?
2 A Not really exactly what they found. I just -- that was
3 the resolution of the situation.
4 Q Do you know if they found if you breached any duty?
5 A No.
6 Q No, they didn't, or no, you don't know?
7 A I don't think so.
8 Q What about the third one?
9 A I think that's the only two I am aware of that. Oh, the
10 third one was a long time ago about the clinic I was
11 working on, we used to own it, and somebody vandalized
12 the clinic and destroyed medical records and it was
13 problematic and it was investigated and it was dropped.
14 Q Did you ever have a patient by the name of Jane Wilson?
15 A Yes.
16 Q Did she or her family ever sue you?
17 A Yes.
18 Q What was that suit for?
19 A It was for allegation that I have sexual conduct with
20 her and her husband.
21 Q So I believe I asked earlier in the deposition if there
22 was a complaint by a woman who alleged that you had sex
23 with her when she was a patient.
24 A Okay. I thought you were questioning if I have any
25 sexual relationship. Okay.

**Page 30**

1 Q All right. So can you tell me, was that the only charge
2 in Miss Wilson's case, that you had had sex with her and
3 her husband?
4 A I don't think it was a charge. It was a civil lawsuit.
5 Q Civil. I apologize, I don't mean criminal. I didn't
6 mean to suggest it was criminal or administrative, but
7 in terms of what was alleged against you were there any
8 other allegations?
9 A No.
10 Q And how did that suit resolve?
11 A It was settled. The lawsuit was settled also.
12 Q And how much did you pay in that settlement?
13 A 60.
14 Q 60,000?
15 A Yes.
16 Q Was Miss Wilson injured -- did she allege that she
17 suffered some injuries as a result of misconduct on your
18 part?
19 A She was not injured, no. There's no injury.
20 Q Did Miss Wilson shoot herself? Did she shoot herself?
21 A No. Not to my knowledge, no.
22 Q Were there any other licensing actions that you are
23 aware of?
24 A No.
25 Q Any other discipline?

**Page 31**

1 A No.
2 Q I know there was the fine you mentioned. Anything other
3 than that?
4 A No.
5 Q Are you aware of any other patient complaints to the
6 licensing agency?
7 A I'm not aware of that.
8 Q When does your license expire?
9         MR. RYAN: I'm sorry. I didn't hear the
10 question.
11         MS. CHANEY: When does his license expire?
12         THE WITNESS: I don't know.
13 BY MS. CHANEY:
14 Q What was the value of the art that the government took
15 from your home?
16 A According to their estimation, like fifty thousand or
17 fifty two.
18 Q Is that an accurate estimation?
19 A Yeah, I believe so.
20 Q Have you seen any press coverage of the search warrant
21 being executed?
22 A I've never seen it.
23 Q Have you seen any press coverage regarding yourself at
24 all?
25 A No.

**Page 32**

1 Q You have been a psychiatrist for how long?
2 A Since 1984.
3 Q Have you ever been licensed in any other country to
4 practice medicine?
5 A No.
6 Q Have you practiced any other type of medicine other than
7 psychiatry?
8 A No.
9 Q Are you licensed in any other state other than Michigan
10 to practice medicine?
11 A No.
12 Q Have you ever been?
13 A No.
14 Q Have you ever written a prescription for medication in
15 someone's name when there was not a medical need for the
16 drug?
17 A On the advice of my attorney I assert my Fifth Amendment
18 right.
19 Q Have you ever written a prescription for a person who
20 was not your patient?
21 A On the advice of my attorney I assert my Fifth Amendment
22 privilege.
23 Q Have you ever written a prescription for a person for
24 whom you did not first conduct a medical examination?
25 A On the advice of my attorney I assert my Fifth Amendment



MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
33-36

Page 33

1 privilege.
2 Q And the same question with regard to a psychiatric
3 assessment, have you ever written a prescription for a
4 person for whom you did not perform a psychiatric
5 assessment?
6 A The same answer.
7 Q I need you to assert it.
8 A On the advice of my attorney I assert my Fifth Amendment
9 privilege.
10 Q Have you ever written a prescription for a person in
11 exchange for cash?
12 A On the advice of my attorney I assert my Fifth Amendment
13 privilege.
14 Q Have you ever written a prescription for a person in
15 exchange for personal or real property?
16 A On the advice of my attorney I assert my Fifth Amendment
17 privilege.
18 Q Have you ever written a prescription for a person in
19 exchange for sex or sexual favors?
20 A On the advice of my attorney I assert my Fifth Amendment
21 privilege.
22 Q Have you ever written a prescription for a friend as a
23 favor?
24 A On the advice of my attorney I assert my Fifth Amendment
25 privilege.

Page 34

1 Q Have you ever written a prescription for another person
2 in exchange for any personal benefit to yourself?
3 A On the advice of my attorney I assert my Fifth Amendment
4 privilege.
5 Q Have you ever written a prescription for another person
6 for any personal benefit to that person other than for
7 treatment of a medical condition?
8 A On the advice of my attorney I assert my Fifth Amendment
9 privilege.
10 Q Did you ever write a prescription for medication with
11 the intent and knowledge that the medication would be
12 sold or provided to other persons?
13 A On the advice of my attorney I assert my Fifth Amendment
14 privilege.
15 Q Were you ever asked to write a prescription for drugs
16 for any of these purposes, even if you didn't do so?
17 A On the advice of my attorney I assert my Fifth Amendment
18 privilege.
19 Q This may be a little tedious, but I'll just try to sum
20 it up. Have you ever provided medications, not
21 prescriptions but medications themselves to persons in
22 exchange for money?
23 A On the advice of my attorney I assert my Fifth Amendment
24 privilege.
25 Q Have you ever provided such medications to a person in

Page 35

1 exchange for personal or real property -- I'll just read
2 this as one long question.
3 MR. GRIEM: All right.
4 BY MS. CHANEY:
5 Q -- sex or sexual favors, as a favor to a friend, for any
6 personal benefit to yourself, for any personal benefit
7 to the other person other than for treatment of a
8 medical condition or with the intent or knowledge that
9 that medication would be sold or provided to other
10 persons?
11 A On the advice of my attorney I assert my Fifth Amendment
12 privilege.
13 Q Have you ever heard of the term sex trafficking?
14 A Yes.
15 Q What do you understand it to be?
16 A I'm not sure what -- of people's intention when they say
17 sex trafficking. It could be having people from
18 different country to another country for sexual purpose
19 or it could be sexual -- using a person for sexual
20 actions or they can have them make -- they can use it as
21 money machine or making money from it.
22 Q Okay. How do you have that knowledge? What informs
23 your understanding of it?
24 A The question, I really have no idea how to answer it.
25 That's an opinion from hearing it in the news or things

Page 36

1 like that is basically how I form my opinion on that.
2 Q Did you ever learn about sex trafficking or human
3 trafficking as part of any training that you did as a
4 psychiatrist?
5 A We don't have any training in that area, no.
6 Q Have you seen any documentaries on sex trafficking?
7 A I don't remember if I have seen any documentaries.
8 Q When is the last time you recall seeing anything in the
9 news with regard to sex trafficking?
10 A That's a question I really don't know the answer. I
11 hear about it in different country like in Asia or in
12 Sudan or different, but I can't tell you exactly when
13 the last time I have seen anything.
14 Q Have you ever heard of labor trafficking?
15 A No.
16 Q What about human trafficking as a term, have you heard
17 of that before?
18 A No.
19 Q Have you ever engaged in sex trafficking?
20 A On the advice of my attorney I assert my Fifth Amendment
21 privilege.
22 Q Have you ever associated with any persons involved in
23 section trafficking?
24 A On the advice of my attorney I assert my Fifth Amendment
25 privilege.



MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
37–40

Page 37

1 Q Have you ever provided any prescriptions or medications
2 as part of a sex trafficking scheme?
3 A On the advice of my attorney I assert my Fifth Amendment
4 privilege.
5 Q Was it your habit to carry a prescription pad in a fanny
6 pack?
7 A On the advice of my attorney I assert my Fifth Amendment
8 privilege.
9 Q We talked before about the office that was located on
10 Ryan Road. Were there other psychiatrists who used that
11 office?
12 A Yes.
13 Q How many other psychiatrists?
14 A I don't know currently how many. In the past there was
15 a few physicians working there also.
16 Q At the time that they executed the search warrant were
17 there other physicians that worked there?
18 A On the advice of my attorney I assert my Fifth Amendment
19 privilege.
20 Q In 2013 did you ever frequent any Michigan -- southeast
21 Michigan area strip clubs?
22 A On the advice of my attorney I assert my Fifth Amendment
23 privilege.
24 Q Are you familiar with a man by the name of Mark Luke
25 White?

Page 38

1 A On the advice of my attorney I assert my Fifth Amendment
2 privilege.
3 Q So I'm going to ask you a series of questions that may
4 seem ridiculous in light of your assertion of the
5 privilege, but we just need to make the record. Okay?
6 A Okay.
7 Q Did Mr. White ever contact you about providing him
8 prescriptions or medication?
9 A On the advice of my attorney I assert my Fifth Amendment
10 privilege.
11 Q Did you ever meet with Mr. White to provide him
12 prescriptions or medication?
13 A On the advice of my attorney I assert my Fifth Amendment
14 privilege.
15 Q Did you ever go to Mr. White's home?
16 A On the advice of my attorney I assert my Fifth Amendment
17 privilege.
18 Q Are you familiar with a woman by the name of ▮
19 ▮?
20 A On the advice of my attorney I assert my Fifth Amendment
21 privilege.
22 Q Do you ever recall seeing ▮ at Mr. White's
23 home?
24 A On the advice of my attorney I assert my Fifth Amendment
25 privilege.

Page 39

1 Q Did you ever see Miss ▮ outside of Mr. White's
2 presence?
3 A On the advice of my attorney I assert my Fifth Amendment
4 privilege.
5 Q Was Mr. White a business associate?
6 A On the advice of my attorney I assert my Fifth Amendment
7 privilege.
8 Q Did you participate with Mr. White in a sex trafficking
9 scheme?
10 A On the advice of my attorney I assert my Fifth Amendment
11 privilege.
12 Q Did you provide to Mr. White prescription medications in
13 facilitation of a sex trafficking scheme?
14 A On the advice of my attorney I assert my Fifth Amendment
15 privilege.
16 Q Did you ever arrange for Mr. White to obtain
17 prescriptions or medications through a third party?
18 A On the advice of my attorney I assert my Fifth Amendment
19 privilege.
20 Q Did Mr. White ever refer anyone to you, a third person
21 to you, to obtain prescriptions or medication?
22 A On the advice of my attorney I assert my Fifth Amendment
23 privilege.
24         (Exhibit Number 1 marked.)
25         MS. CHANEY: I am going to pass Exhibit 1 to

Page 40

1 your attorney sitting here to review. Just for context,
2 these are excerpts from text messages that we pulled off
3 of a phone that was taken from Mr. White's home on
4 execution of a search warrant.
5         MR. GRIEM: We can get a copy afterwards?
6         MS. CHANEY: Yes.
7         MR. RYAN: Once again --
8         MR. GRIEM: I've seen enough for my purposes.
9 We will get you a copy after.
10         MR. RYAN: Would you say again what this is?
11 I was looking at it.
12         MS. CHANEY: Absolutely. These are excerpts
13 from text messages that were pulled off the telephone
14 that was taken from Mr. White's -- the cell phone that
15 was taken from Mr. White's home upon execution of a
16 search warrant.
17         MR. RYAN: Okay.
18 BY MS. CHANEY:
19 Q So Mr. Dabbagh, if you could take a moment and look at
20 that document and then just let me know when you're
21 ready.
22 A (Looks at document.)
23         MR. RYAN: So this is from one of the phones
24 at the Southfield Police Department?
25         MS. CHANEY: Correct, sir. The last page of



800.211.DEPO (3376)
EsquireSolutions.com

MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
41–44

**Page 41**

1  this document, it's stamped 2680, is an excerpt from
2  that same phone and it is the contacts page where it
3  shows the creation date or modification date of a
4  contact that's entered into the phone. And that is the
5  last page, 2680.
6      MR. GRIEM: We're ready.
7  BY MS. CHANEY:
8  Q  Mr. Dabbagh, do you recognize the messages in that
9     excerpt?
10 A  On the advice of my attorney I assert my Fifth Amendment
11    privilege.
12 Q  In March of 2013 was your phone number 248-961-3421?
13 A  Yes.
14 Q  Did you receive a text message from Mr. White asking if
15    you were prepared for a meeting that evening?
16 A  On the advice of my attorney I assert my Fifth Amendment
17    privilege.
18 Q  Did you actually attend a meeting with Mr. White that
19    evening?
20 A  On the advice of my attorney I assert my Fifth Amendment
21    privilege.
22 Q  If we look at the first page stamped 985 --
23     MR. RYAN: I've got it. What do you want him
24    to look at?
25     MR. GRIEM: Just let her ask the question.

**Page 42**

1      MR. RYAN: Okay.
2  BY MS. CHANEY:
3  Q  Where it says -- If we look down to the third box it
4     says sender, Mamoun, and then it says text, I think so,
5     what is you [sic] condo number. Did you send that
6     message?
7  A  On the advice of my attorney I assert my Fifth Amendment
8     privilege.
9  Q  If you look down a little further there appears to be a
10    response that says: Recipient, Mamoun, that's great
11    news, and then additional text. Did you receive that
12    response?
13 A  On the advice of my attorney I assert my Fifth Amendment
14    privilege.
15 Q  Okay. Then there is a response, on my way. Did you
16    send that response?
17 A  On the advice of my attorney I assert my Fifth Amendment
18    privilege.
19 Q  On the third page stamped 1253 there is a text,
20    recipient Mamoun. The text says: Hi, doc, it's time to
21    get reloaded, call or text when you have a second. Did
22    you receive that text?
23 A  On the advice of my attorney I assert my Fifth Amendment
24    privilege.
25 Q  Can you tell me what is meant by the message, it's time

**Page 43**

1     to get reloaded?
2  A  On the advice of my attorney I assert my Fifth Amendment
3     privilege.
4  Q  Did you ever, in fact, provide to Mr. White any
5     prescriptions or medications in response to that
6     request?
7  A  On the advice of my attorney I assert my Fifth Amendment
8     privilege.
9  Q  Did you know Mr. White in 2012?
10 A  On the advice of my attorney I assert my Fifth Amendment
11    privilege.
12 Q  Did you ever receive from Mr. White any money or gifts?
13 A  On the advice of my attorney I assert my Fifth Amendment
14    privilege.
15 Q  Did you ever do any favors for Mr. White or receive any
16    favors from Mr. White?
17 A  On the advice of my attorney I assert my Fifth Amendment
18    privilege.
19 Q  Did you go to Mr. White's home on the evening of
20    March 25th, 2013?
21 A  On the advice of my attorney I assert my Fifth Amendment
22    privilege.
23 Q  Did you do an assessment of Miss [redacted] that night at
24    Mr. White's condo?
25 A  On the advice of my attorney I assert my Fifth Amendment

**Page 44**

1     privilege.
2  Q  Have you ever done any medical assessment of the
3     plaintiff in this case, Miss [redacted]?
4  A  On the advice of my attorney I assert my Fifth Amendment
5     privilege.
6  Q  By medical assessment I am including psychiatric
7     assessment.
8  A  On the advice of my attorney I assert my Fifth Amendment
9     privilege.
10 Q  In 2013 when you would treat a patient, what was your
11    practice with regard to medical documentation?
12     MR. RYAN: I don't understand the question.
13    Are you talking about medical charts?
14     MS. CHANEY: I'm asking what his practice is
15    when he would meet with a new patient in terms of doing
16    medical documentation, what kind of forms would they
17    fill out, what kind of documents would you prepare?
18     MR. GRIEM: Now that you've made that
19    explanation --
20     THE WITNESS: On the advice of my attorney I
21    assert my Fifth Amendment privilege.
22 BY MS. CHANEY:
23 Q  Do you have any documents reflecting medical or
24    psychiatric care provided to [redacted]?
25 A  On the advice of my attorney I assert my Fifth Amendment



MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
45–48

Page 45

1  privilege.
2  Q  Do you have any documents reflecting any kind of
3     communication with or relationship with Mark White?
4  A  On the advice of my attorney I assert my Fifth Amendment
5     privilege.
6  Q  Did you destroy any documents with regard to either
7     ▓▓▓▓▓▓▓▓ or Mark White?
8  A  On the advice of my attorney I assert my Fifth Amendment
9     privileges.
10 Q  Did you delete any electronic messages including text
11    messages, voice mails, e-mails, that reflect
12    communications with Mark White?
13 A  On the advice of my attorney I assert my Fifth Amendment
14    privilege.
15 Q  Did you destroy any electronic devices that might have
16    or might have had communications between you and Mark
17    White?
18 A  On the advice of my attorney I assert my Fifth Amendment
19    privilege.
20 Q  Did you know that Mark White was sex trafficking ▓▓▓
21    ▓▓▓▓▓▓▓?
22 A  On the advice of my attorney I assert my Fifth Amendment
23    privilege.
24 Q  Did you know that Mr. White was sex trafficking any
25    woman?

Page 46

1  A  On the advice of my attorney I assert my Fifth Amendment
2     privilege.
3  Q  Did Mr. White ever arrange for you to meet with a woman
4     for any purpose?
5  A  On the advice of my attorney I assert my Fifth Amendment
6     privilege.
7  Q  Have you ever had any training on domestic violence?
8  A  I'm not sure if I have any formal training, but we had
9     in our clinic -- I had a clinic -- in the 1990s when we
10    had a program for domestic violence and we had -- we
11    worked with the law enforcement agency in Wayne County
12    for treating the women -- mainly women with physical
13    abuse and also sexual abuse. So we had a lot of work on
14    that area in my clinic, mainly in Taylor and Livonia at
15    that time. So we had extensive program in that area.
16 Q  What was the name of that clinic?
17 A  Clinic name, ACT Specialist.
18 Q  I'm sorry?
19 A  ACT Specialist.
20 Q  And for what years were you involved in that work?
21 A  Probably 1995 until 2000, or it could be more, 1992
22    until 2000.
23 Q  Were there telltale signs or red flags that as a
24    psychiatrist you would look for to see if a woman was
25    being abused?

Page 47

1  A  Besides the physical sign and the physical condition, a
2     lot of difficulty in terms of depression, anxiety, panic
3     attacks, nightmares, a lot of low self-esteem, passive
4     behavior and for being submissive. But mainly we see a
5     lot of depression and anxiety with these women. But
6     also we had part of the program treating the
7     perpetrators, so we had a lot of patients with criminal
8     background. We would treat them for physical abuse and
9     also for sexual abuse.
10 Q  And when you talk about physical condition, what kind of
11    things would you look for or would raise red flags for
12    you?
13 A  I mean basically if there is any sign of trauma, any
14    sign of bruises, black eyes, these kind of symptoms.
15    But most of our patients also they come from -- they've
16    already been adjudicated and already been resolved, some
17    issue. Some of them it was not resolved yet and some of
18    them were resolved.
19 Q  Did ▓▓▓▓▓▓▓▓ ever exhibit signs of being abused?
20 A  On the advice of my attorney I assert my Fifth Amendment
21    privilege.
22 Q  You said that you would work with -- correct me if I'm
23    wrong, you would work with people who were doing the
24    abusing, the abusers as well, correct?
25 A  Correct.

Page 48

1  Q  Were there certain personality traits or behaviors that
2     you noted were particular to abusers?
3  A  We see a lot of problem with -- for the perpetrator a
4     lot of aggressive behavior, a lot of anger, a lot of
5     control issues, a lot of low self-esteem. We see a lot
6     of difficulty with attention span, impulsivity and these
7     issues.
8  Q  Did you ever see Mark White exhibit these issues --
9     these characteristics?
10 A  On the advice of my attorney I assert my Fifth Amendment
11    privilege.
12 Q  Did you personally ever have any thoughts that ▓▓▓▓
13    ▓▓▓▓▓▓▓▓ could have been abused or may have been an
14    abused woman?
15 A  On the advice of my attorney I assert my Fifth Amendment
16    privilege.
17 Q  Did you ever have the thought that Mr. White was abusing
18    Miss ▓▓▓▓▓▓▓▓?
19 A  On the advice of my attorney I assert my Fifth Amendment
20    privilege.
21 Q  Who is Joseph Young?
22 A  On the advice of my attorney I assert my Fifth Amendment
23    privilege.
24 Q  You identify him as a potential expert in this civil
25    case and as a witness. Do you intend to rely on him in

MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
49–52

Page 49

1  this case as a witness?
2  A  He's one of -- he's a psychiatrist in town. He's a
3     child psychiatrist. He's very prominent. He wrote
4     books about different areas in psychiatry.
5  Q  What information do you think he would have with regard
6     to this case?
7  A  What information did he have or would he have?
8  Q  Would he have regarding this case?
9  A  I expect any physician to look at the symptoms and the
10    signs and also look at the diagnosis and advise if the
11    medication or treatment plan was appropriate or not.
12       MR. RYAN: And I'll object. I think you're
13    asking him for a legal conclusion.
14 BY MS. CHANEY:
15 Q  Where are you currently working?
16 A  I am working at Behavior Center of Michigan, which is a
17    psychiatric hospital in Warren, and also Samaritan
18    Behavioral Center, which is another psychiatric
19    hospital. And also I do consultation in multiple
20    nursing homes.
21 Q  And you're a medical director at Samaritan and
22    Behavioral Center; is that right?
23 A  You know, I was at a certain time. Not anymore.
24 Q  Currently you're a staff psychiatrist at both of those?
25 A  Correct.

Page 50

1  Q  Have you taught at Michigan State University?
2  A  I have, mainly for medical students. I was more like an
3     instructor when I was working at Havenwyck Hospital.
4  Q  What courses did you --
5  A  It was mainly on site training with -- they come, the
6     students come spend a whole month in our program and I
7     was supervising them.
8  Q  Did Mr. White ever represent to you that he was a pimp?
9  A  On the advice of my attorney I assert my Fifth Amendment
10    privilege.
11       (Exhibit Number 2 marked.)
12 BY MS. CHANEY:
13 Q  Do you recognize this document, Dr. Dabbagh?
14 A  (Looks at document.)
15       MR. RYAN: They used the back of the pages, so
16    you have got to flip every page on the back.
17       MR. GRIEM: He did
18       MR. RYAN: The last page?
19       MR. GRIEM: Oh, the last page. (Indicating.)
20       THE WITNESS: Yeah, I do.
21 BY MS. CHANEY:
22 Q  So these are your answers to plaintiff's second set of
23    interrogatories. One of the things that I asked you
24    about in these interrogatories is the information that
25    you received from Miss [redacted] or you say you received

Page 51

1     from Miss [redacted] before writing a prescription; is
2     that correct?
3  A  On the advice of my attorney I assert my Fifth Amendment
4     privilege.
5  Q  Are the responses that you provided in this document
6     accurate and complete?
7  A  On the advice of my attorney I assert my Fifth Amendment
8     privilege.
9  Q  You mentioned in one of the responses in Subsection B
10    that your observations of Miss [redacted] were that she
11    looked sad and haggard, her affect was blunted and she
12    lacked facial expressions. Are those also
13    characteristics of abused women?
14 A  On the advice of my attorney I assert my Fifth Amendment
15    privilege.
16 Q  Was Mr. White present when you made these observations?
17 A  On the advice of my attorney I assert my Fifth Amendment
18    privilege.
19 Q  If you look at your response to Interrogatory Number 2
20    where I ask you to identify the specific diagnosis, you
21    state major depressive disorder and attention deficit
22    disorder. Are those complete and accurate diagnoses of
23    Miss [redacted]?
24 A  On the advice of my attorney I assert my Fifth Amendment
25    privilege.

Page 52

1  Q  Did you ever consider Miss [redacted] to be your patient?
2  A  On the advice of my attorney I assert my Fifth Amendment
3     privilege.
4  Q  At any time did you ever have a patient-physician
5     relationship with Miss [redacted]?
6  A  On the advice of my attorney I assert my Fifth Amendment
7     privilege.
8  Q  Did you write prescriptions in Miss [redacted] name
9     because Mark White paid you to do so?
10 A  On the advice of my attorney I assert my Fifth Amendment
11    privilege.
12       MR. RYAN: I'll object to the question. It
13    assumes facts not in evidence. Form of the question
14    objection and foundation.
15 BY MS. CHANEY:
16 Q  Did you ever write prescriptions for Miss [redacted]?
17 A  On the advice of my attorney I assert my Fifth Amendment
18    privilege.
19 Q  Would you agree that to do a complete -- well, let me
20    ask you this. Before you prescribe any kind of
21    medication to a patient, would you agree that you need
22    to perform a complete psychiatric assessment?
23 A  On the advice of my attorney I assert my Fifth Amendment
24    privilege.
25 Q  Does a psychiatric assessment typically include getting

MAMOUN DABBAGH M.D.  
JANE DOE vs. DABBAGH

February 18, 2016  
53–56

### Page 53

1     a history of the patient's present illness and current  
2     symptoms?  
3 A  On the advice of my attorney I assert my Fifth Amendment  
4     privilege.  
5 Q  So I'm not asking you right now about what you did with  
6     Miss [redacted]  I'm asking just based on your knowledge  
7     as a psychiatrist your understanding of what a complete  
8     psychiatric assessment involves. So with that  
9     understanding, to your knowledge would that involve  
10    obtaining a history of the present illness and current  
11    symptoms?  
12 A  On the advice of my attorney I assert my Fifth Amendment  
13    privilege.  
14 Q  Would you also have to get -- and I'll just list them:  
15    Psychiatric history, general medical history, medication  
16    history, history of substance abuse and treatment for  
17    such, her personal and social history, family history  
18    and a physical examination?  
19 A  On the advice of my attorney I assert my Fifth Amendment  
20    privilege.  
21 Q  For a patient that you are concerned of -- concerned  
22    about with regard to depression, would you also evaluate  
23    that person's suicide risk?  
24 A  On the advice of my attorney I assert my Fifth Amendment  
25    privilege.

### Page 54

1 Q  Did you do any of those things for Miss [redacted]?  
2 A  On the advice of my attorney I assert my Fifth Amendment  
3    privilege.  
4 Q  In 2013 was it common practice for you to treat people  
5    in their homes?  
6 A  On the advice of my attorney I assert my Fifth Amendment  
7    privilege.  
8       (Exhibit Number 3 marked.)  
9 BY MS. CHANEY:  
10 Q  If you could look at Exhibit 3, these are defendant's  
11    answers to plaintiff's first requests to admit. Let me  
12    know when you are ready.  
13 A  Okay.  
14       MR. GRIEM: Ready.  
15 BY MS. CHANEY:  
16 Q  Do you recognize this document, sir?  
17 A  Yes.  
18 Q  Are the answers provided true and complete?  
19 A  On the advice of my attorney I assert my Fifth Amendment  
20    privilege.  
21       MR. RYAN: I'll object, compound question in  
22    the extreme, so it's a form objection.  
23 BY MS. CHANEY:  
24 Q  So let's look at Question Number 4 on Page 2.  
25    Actually let's look at Question Number 3. It says:

### Page 55

1     Please admit that Adderall is a stimulant drug  
2     classified by the Drug Enforcement Administration as a  
3     Schedule II drug. Do you see that request?  
4 A  Yes.  
5 Q  It says, response: Defendant admits only that Adderall  
6    was listed in Exhibit B as a Schedule II drug. Is it  
7    true that Adderall is a stimulant drug?  
8 A  Yes.  
9 Q  Can Adderall be used to make a person feel more alert or  
10   aware when they would otherwise be tired?  
11 A  Yes.  
12 Q  Can Adderall be used to keep a person going longer  
13   through exhaustion than they otherwise might be able to?  
14 A  Repeat the question, counselor?  
15 Q  Sure. Can Adderall be used to keep a person going  
16   longer through exhaustion whereas they otherwise might  
17   not be able to?  
18 A  Not usually.  
19 Q  Why is that?  
20 A  Because it's -- when the person is exhausted, it's  
21   exhausted. Even with a stimulant they can't maintain.  
22 Q  Will Adderall help keep them more aware or alert even if  
23   they are exhausted as a stimulant drug?  
24 A  Not usually.  
25 Q  So how is it that when they're tired it can help them

### Page 56

1     stay more alert or aware, but not when they're  
2     exhausted?  
3 A  Again repeat the question please?  
4 Q  So earlier I asked the question if they're tired can  
5    Adderall be used to keep them more alert and aware and  
6    you said yes. Then when I said exhausted you said no,  
7    so I'm just trying to understand why is there a  
8    difference?  
9 A  It's basically a stimulant not used for -- it's used for  
10   the attention span and concentration. It's not used for  
11   tiredness. So it's really -- basically the purpose of  
12   using it is for improved attention span and  
13   concentration. It's not for increase people's energy or  
14   make them awake all the time.  
15 Q  All right. It's not used for that, but can it have that  
16   effect?  
17 A  It might have some effect like that, yes.  
18 Q  If we look at Number 4 it says: Please admit that  
19   Adderall has a high potential for abuse with use  
20   potentially leading to severe psychological or physical  
21   dependence. And the response is: Denied as untrue.  
22   Can you tell me what about that statement is untrue?  
23 A  I don't believe Adderall has a high potential for abuse.  
24   I have been doing substance abuse for almost 30 years.  
25   I've rarely seen anybody who comes to do any treatment



MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
57–60

Page 57

1 for substance abuse with significant high dose of
2 Adderall. It's mainly Adderall used for people to
3 function better in terms of their concentration than
4 abuse. People may have been abusing it, but it isn't
5 highly abusable. It's widely abusable but not highly
6 abusable.
7 Q Can it lead to severe psychological or physical
8 dependence in some cases?
9 A No.
10 Q Is there a street market for Adderall?
11 A There's always a street market for anything, so I don't
12 -- I can't answer that question and -- so I can't. I
13 don't know the answer for that question.
14 Q So you don't know if Adderall is sold on the streets?
15 A No, I -- does it have a street market? I don't know the
16 street market, I think I know people -- kids in high
17 school, sometimes they pass it together and the same
18 with college kids, so they can focus on their reading.
19 Does it have street value? Adderall has street value --
20 it does, but is it highly abusable? I don't think it's
21 highly abusable.
22 Q What's the street value of Adderall?
23 A I don't know.
24 Q How do you know about kids and stuff using it?
25 A I'm a child psychiatrist. I work with children also.

Page 58

1 Q So is that something like that was of your training --
2 A Yes.
3 Q -- or just you working with patients who have issues
4 with it?
5 A Yes. And I run substance abuse for children in that
6 same program also.
7 Q Let me ask you this. Have you ever in your practice
8 treated sex trafficking victims? Survivors?
9 A I mean I have treated a lot of people with sexual trauma
10 and we had a program, sexual -- we call it sexual trauma
11 resolutions, dealing with different kinds of trauma and
12 including sexual trauma. I've run a program for sexual
13 abuse and myself and my staff run group therapy and even
14 we run almost partial hospitalization when people come
15 from the morning until evening and we deal with these
16 issues. We have individual counseling, group
17 counseling, medication management, also training about
18 meditation. And we work on specific trauma and we had
19 extensive program in that for quite -- really a long
20 period of time. So I worked with sexual abuse
21 substantially and when I worked in Detroit working with
22 teenagers, we had a specific program when we worked with
23 people with physical abuse and sexual abuse. I was
24 dealing with these kids for quite a long time.
25 And there's a few cases -- there is one case,

Page 59

1 very famous case, when the mom was giving her kids for
2 drug dealer to have sex with and I treated her and the
3 woman went to jail and also the drug dealer went to
4 jail. So I'm very familiar with this area and I worked
5 very hard in the last -- in my career in that area. So
6 we focus -- and we still see a lot of people with
7 physical trauma and sexual trauma in our program,
8 especially in the hospital.
9 So the question, yes, I have. Do I know of a
10 specific case in my mind I remember? I've seen so many
11 cases, I work with so many people, so I can't have
12 specific in my mind at this time.
13 Q So other than the one instance you told me about, are
14 you aware of any other instances in which you treated
15 someone who was sold for sex against their will?
16 A I'm sure I have. I don't have any specific in my mind
17 at this time.
18 Q What are the flags you would look for? I know we talked
19 earlier about domestic violence. What are the flags one
20 might look for with regard to someone who's being
21 sexually traumatized?
22 A It depends how they cope with it. Some people were able
23 cope with it so they go and would function quite
24 normally. Some people can't. And one of the -- used to
25 be more common than now when people get dissociative

Page 60

1 behavior, when they start dissociative feeling and they
2 have a loss of memory and they have a lot of difficulty
3 in terms of panic attacks and alteration in their
4 physical condition. And the most ultimate one would be
5 the multiple personality. And it seemed to become not
6 very common at this time, but multiple personality was
7 one of the signs of like physical and sexual abuse,
8 especially sexual abuse. And I remember we had like
9 almost a whole group of woman with multiple personality.
10 So that's one of the signs, but also lack of
11 sleep, lack of concentration, as I said, low
12 self-esteem, panic attacks, anxiety. But that's really
13 -- nightmares, a lot of nightmares also with these
14 patients.
15 Q That would include women who are being sold for sex to
16 your knowledge?
17 A Yeah. I really don't have any specific in my mind about
18 people being sold for sex, but that would be the same
19 probably. It's more mainly trauma that's always --
20 trauma has the same symptomatology. It kind of depends,
21 varies from the different -- the kind of trauma they
22 have.
23 Q When you are meeting with a patient for the first time
24 do you assess for abuse?
25 A On the advice of my attorney I assert my Fifth Amendment

MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
61—64

Page 61

1  privilege.
2  Q  Did you ever assess Miss ▮▮▮ for abuse?
3  A  On the advice of my attorney I assert my Fifth Amendment
4     privilege.
5  Q  When I say abuse, I want to be a little more broad and
6     include in that assessing her for control where she's
7     being sold or abused by Mr. White.
8  A  On the advice of my attorney I assert my Fifth Amendment
9     privilege.
10 Q  If you look down at Request Number 6, still Exhibit 3,
11    Request Number 6 says: Please admit that plaintiff did
12    not contact -- did not initiate contact with Dr. Dabbagh
13    to obtain psychiatric treatment. Response is: Deny as
14    untrue. Plaintiff initiated contact with the defendant
15    through her friend Mr. White. Did you ever at any time
16    talk directly with ▮▮▮?
17 A  On the advice of my attorney I assert my Fifth Amendment
18    privilege.
19 Q  Is this a true statement in your response: The
20    plaintiff initiated contact?
21 A  On the advice of my attorney I assert my Fifth Amendment
22    privilege.
23 Q  When you meet with a new patient for the first time
24    approximately how long does it take you to do a
25    psychiatric assessment?

Page 62

1  A  On the advice of my attorney I assert my Fifth Amendment
2     privilege.
3  Q  So in 2012 before the timeline involved here in this
4     case, were you seeing patients?
5  A  Yes.
6  Q  Did you have any new patients in 2012?
7  A  Yes.
8  Q  How long did it take you to do a psychiatric evaluation?
9  A  On the advice of my attorney I assert my Fifth Amendment
10    privilege.
11 Q  Can you do a full and complete psychiatric evaluation on
12    a new patient in 20 minutes?
13 A  On the advice of my attorney I assert my Fifth Amendment
14    privilege.
15 Q  Can you do it in 30 minutes?
16 A  On the advice of my attorney I assert my Fifth Amendment
17    privilege.
18 Q  If you look at Request Number 8 -- and I'll just ask you
19    to look at it and then read through your response.
20 A  (Looks at document.)
21 Q  Is that response that you provided there true and
22    accurate?
23 A  On the advice of my attorney I assert my Fifth Amendment
24    privilege.
25 Q  Is it true that Adderall may be habit forming?

Page 63

1  A  To my view about Adderall, I don't think it is habit
2     forming.
3  Q  Is Adderall used for anything other than ADHD?
4  A  Narcolepsy.
5  Q  And is that to help keep people awake?
6  A  It's for -- yeah. It's for people with severe
7     difficulty in terms of waking up.
8  Q  So does the drug function to help keep them awake so
9     that they don't fall asleep?
10 A  For that indication, yes.
11 Q  Are there circumstances, medical circumstances, in which
12    a person should not take Adderall?
13 A  Psychosis.
14 Q  Psychosis?
15 A  Yes.
16 Q  Is that the only one?
17 A  That's for psychiatric condition. Medical condition,
18    maybe high blood pressure.
19 Q  Did you take Miss ▮▮▮ blood pressure before you
20    prescribed Adderall?
21 A  On the advice of my attorney I assert my Fifth Amendment
22    privilege.
23 Q  Did you ask her about her blood pressure history?
24 A  On the advice of my attorney I assert my Fifth Amendment
25    privilege.

Page 64

1  Q  Are you aware of any other circumstance in which a
2     person should not take Adderall?
3  A  No.
4  Q  What if they have a history of drug or alcohol
5     addiction?
6  A  Actually most of the opinion about Adderall with history
7     of substance abuse is that it might be extremely helpful
8     for certain conditions, especially for cocaine abuse.
9     It can help with the patient, reduce a lot of craving
10    for cocaine. And also in different addiction, it might
11    help the patient be more able to concentrate and focus
12    on recovery. So I -- most of the opinion now,
13    especially the opinion that a lot of people with
14    substance abuse, they would be also suffering from
15    attention deficit disorder, seems to be very coinciding,
16    almost like a hundred percent. So I think treatment of
17    ADD would help the patient navigate through their
18    addiction more effectively.
19 Q  So you think it could be helpful in such an instance?
20 A  Extremely helpful.
21 Q  What about heart disease or coronary artery disease,
22    can you prescribe Adderall in those circumstance or does
23    it just depend?
24 A  It depends.
25 Q  Okay. Do you need to know whether or not a person has



MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
65–68

Page 65

1 heart disease or coronary artery disease before you
2 prescribe Adderall?
3 A It depends on their age. If they are above age 65 I
4 might consider getting EKG, but patient up to 40 or even
5 50 I wouldn't think this will be a major issue for them
6 to take Adderall or a stimulant.
7 Q Do you ask a person about their coronary or heart
8 disease history prior to prescribing Adderall?
9 A On the advice of my attorney I assert my Fifth Amendment
10 privilege.
11 Q Did you ask Miss ▓▓▓▓▓ about any of these issues
12 before you prescribed Adderall?
13 A On the advice of my attorney I assert my Fifth Amendment
14 privilege.
15 Q Do you agree with the statement that all patients being
16 treated with any type of antidepressant should be
17 observed closely for clinical worsening and suicidality,
18 especially during the first few months of therapy and
19 when the dose is modified?
20 A On the advice of my attorney I assert my Fifth Amendment
21 privilege.
22 Q Did you make any arrangements to follow up with Miss
23 ▓▓▓▓▓ after the prescriptions were written?
24 A On the advice of my attorney I assert my Fifth Amendment
25 privilege.

Page 66

1 Q Did you make any arrangements for Miss ▓▓▓ -- or Miss
2 ▓▓▓▓▓ to have talk therapy as part of her treatment?
3 A On the advice of my attorney I assert my Fifth Amendment
4 privilege.
5 Q Do you agree that the best practice for someone
6 suffering from depression is a combination of medicine
7 and talk therapy?
8 A Not necessarily all the time. It depends on the
9 patient's condition.
10 Q If someone is suffering from major depressive disorder
11 would you agree that best practice is that they have a
12 combination of medicine and talk therapy?
13 A It depends on the talk therapy. Most of the talk
14 therapy might not be useful for depression treatment in
15 the first stages, however more supportive directive
16 might be useful in terms of advising the patient about
17 lifestyle, exercise, nutritional issues, support. Their
18 education, mainly education about depression, seems to
19 be more useful than anything else.
20 Q Okay. So education with the medication would be best
21 practice?
22 A Yeah. Almost like treatment of diabetes. It's just you
23 give the insulin, but also you give them information
24 about diabetes, how to use it, what to avoid, what not
25 to avoid. This would be very useful.

Page 67

1 Q What information or education did you provide to Miss
2 ▓▓▓▓▓ with regard to major depressive disorder?
3 A On the advice of my attorney I assert my Fifth Amendment
4 privilege.
5 Q Is it possible in your psychiatric -- you have an
6 extensive psychiatric history in terms of your practice.
7 Is it possible in 20 minutes to do a complete
8 psychiatric exam of someone, prescribe them medication
9 and give them the education that they need about their
10 psychiatric conditions in 20 minutes?
11 A On the advice of my attorney I assert my Fifth Amendment
12 privilege.
13 Q Or in 30 minutes?
14 A On the advice of my attorney I assert my Fifth Amendment
15 privilege.
16 Q Is it true that Celexa may impair one's thinking or
17 reactions?
18 A I don't think so.
19 Q When you take someone's -- I've heard the term
20 psychosocial history. What does that mean?
21 A Psychosocial history is basically about the patient's
22 circumstances, where they live and their relationships
23 and what kind of work they do, their hobbies and things
24 like that. That's the psychosocial history.
25 Q And is that part of a regular psychiatric assessment?

Page 68

1 A Correct, more or less.
2 Q Did you get Miss ▓▓▓▓▓ psychosocial history?
3 A On the advice of my attorney I assert my Fifth Amendment
4 privilege.
5 Q Would you consider Mr. White to be a friend?
6 A On the advice of my attorney I assert my Fifth Amendment
7 privilege.
8 Q Have you ever talked to anyone other than an attorney
9 about Mr. White or ▓▓▓▓▓? Other than an
10 attorney.
11 A On the advice of my attorney I assert my Fifth Amendment
12 privilege.
13 Q Have you ever fabricated a diagnosis in order to justify
14 the writing of a prescription?
15 A On the advice of my attorney I assert my Fifth Amendment
16 privilege.
17 Q Have you ever been -- has CVS ever inquired or
18 investigated you for prescription writing habits?
19 A Ask that question again please?
20 Q Right. Have you ever had any inquiries or
21 investigations from CVS with regard to prescriptions
22 that you prescribed or written?
23 A I don't think any investigation to my knowledge, CVS.
24 Q Was there an inquiry?
25 A At a certain time I was -- not inquiry. They just


ESQUIRE

*800.211.DEPO (3376)*
*EsquireSolutions.com*

MAMOUN DABBAGH M.D.  
JANE DOE vs. DABBAGH

February 18, 2016  
69–72

Page 69

1  didn't necessarily like the way -- my style of
2  prescribing.
3  Q  Did they ever contact you with regard to you writing a
4     prescription?
5  A  They have.
6  Q  How many times?
7  A  They just sent me letters. No phone call or anything.
8  Q  They sent you one letter or more than one?
9  A  They sent me one letter. I didn't respond. They sent
10    me another one.
11 Q  When did they send the first letter?
12 A  It will be hard for me to remember when.
13 Q  Last year or before then?
14 A  Before that.
15 Q  2013?
16 A  Probably 2012.
17 Q  2012. Okay. Early in 2012 or late in 2012?
18 A  I can't remember.
19 Q  When did they send the second letter?
20 A  I think within a few months after, maybe '13.
21 Q  And what did the first letter say?
22 A  Basically the first letter was -- they asked me to
23    explain my prescription style basically, and I did not
24    respond.
25 Q  And who is they? Was it a manager or do you know who

Page 70

1     the person was that sent the letter?
2  A  I can't recall who sent it.
3  Q  Was it in regard to a specific prescription or a
4     specific medication?
5  A  Really nothing in particular, no. But if I can recall,
6     at a certain time in my practice I was doing like pain
7     management, because I thought pain -- in my opinion pain
8     is part of psychiatric treatment. 50 percent of all our
9     patients are suffering from pain, difficulty with pain.
10    And I was not happy with the style of pain management
11    clinics, what they do, because they prescribe too much
12    heavy dose of medication and they're very liberal. And
13    I was very -- trying to coordinate between my
14    psychiatric treatment and the pain management in more --
15    like more rational way, like more thoughtful way. And
16    they thought because I'm a psychiatrist I shouldn't be
17    prescribing any pain medication and this was the main
18    concern about the patients.
19 Q  What kind of pain meds were you prescribing?
20 A  I usually used to do a lot of Tramadol, Ultram, which is
21    kind of mild pain management, and the most I prescribed
22    was basically Vicodin and Norco, these two medications.
23    And I chose that route because I didn't want my patient
24    to go to a pain management clinic and get too much
25    injections, which I didn't feel is valid for chronic

Page 71

1  back pain or neck pain. And also I didn't want them to
2  go on OxyContin and different medications that can be
3  more addictive quality.
4     So that's the reason that they -- at that time
5  CVS had difficulty with their -- some store in Florida
6  and they closed some stores, so it became quite more
7  focused on trying to become more cautious about it. And
8  they couldn't understand what's the reason I'm
9  prescribing these medications for my patients, because
10 I'm a psychiatrist.
11    To my knowledge 10 percent of the people who
12 do pain management or specialize in pain management are
13 psychiatrists and a lot of my friends, they are also
14 psychiatrists and pain management. And I had a lot of
15 experience with pain management for the last 20 years,
16 and because of my background in treatment of addiction,
17 I am very cautious about -- I'm really totally against
18 pain medication. I'm totally against even
19 benzodiazepine myself, but people -- they thought I'm
20 exceeding my specialty because I'm a child psychiatrist
21 and I'm a psychiatrist. But I explained to them that
22 I'm also a pain management specialist and I'm
23 specialized in addiction and I have a lot of experience
24 and it would be wise for a physician who has pain
25 management and addiction to work in the same area

Page 72

1     instead of going too far in terms of using medication
2     for pain.
3  Q  So why did you --
4        MR. RYAN: Before you ask another question, I
5     need to take a break and go to the mens' room.
6        (A recess was had from
7        2:48 p.m. to 2:51 p.m.)
8  BY MS. CHANEY:
9  Q  So why did you ignore the first letter?
10 A  On the advice of my attorney I assert my Fifth Amendment
11    privilege.
12 Q  Were you over-prescribing pain meds?
13 A  On the advice of my attorney I assert my Fifth Amendment
14    privilege.
15 Q  Or selling prescriptions for them?
16 A  On the advice of my attorney I assert my Fifth Amendment
17    privilege.
18 Q  What did the second letter say? The second letter.
19 A  On the advice of my attorney I assert my Fifth Amendment
20    privilege.
21 Q  Were your privileges at CVS restricted?
22 A  On the advice of my attorney I assert my Fifth Amendment
23    privilege.
24 Q  Did you tell Mark White not to take the prescriptions
25    you wrote for Miss ▇▇▇▇ to CVS?

ESQUIRE

800.211.DEPO (3376)  
EsquireSolutions.com

MAMOUN DABBAGH M.D.
JANE DOE vs. DABBAGH

February 18, 2016
73–76

Page 73

```
 1  A  On the advice of my attorney I assert my Fifth Amendment
 2     privilege.
 3  Q  Were you contacted by any other pharmacies with regard
 4     to your prescription practices?
 5  A  I think Meijer called me.
 6  Q  When was that?
 7  A  The same, probably 2013.
 8  Q  Was that in early 2013 or mid or late?
 9  A  Probably early.
10  Q  Before March?
11  A  I can't tell.
12  Q  And what did Meijer's say?
13  A  I think they have the same concern and I explained that
14     to them on the phone and they were fine with that. And
15     I explained to them that we are moving toward
16     decreasing, weaning down people from their medication,
17     including pain medication. They were fine with that.
18  Q  Was Meijer's concerned only with regard to pain
19     medication or more general --
20  A  Just pain medications.
21  Q  Were they specifically concerned about narcotic
22     medication?
23  A  It's pain medication. Most of them are narcotics.
24  Q  But was Meijer's specifically concerned about the
25     narcotic prescriptions?
```

Page 74

```
 1  A  Yes.
 2  Q  And is that the same for CVS, they were specifically
 3     concerned about the narcotics?
 4  A  Correct.
 5  Q  Did you have any restrictions at Meijer's?
 6  A  No.
 7  Q  Did any other pharmacies make inquiries about your
 8     prescription practices?
 9  A  Not to my knowledge.
10  Q  The condo, does that have a parking garage?
11  A  Yes.
12  Q  Are you assigned spaces?
13  A  Yes.
14  Q  Was your assigned space near Mr. White's?
15  A  On the advice of my attorney I assert my Fifth Amendment
16     privilege.
17  Q  Did the medication you prescribed to Miss [redacted] did
18     it ever help her?
19  A  On the advice of my attorney I assert my Fifth Amendment
20     privilege.
21  Q  Were you ever contacted by police or law enforcement
22     with regard to Mr. White?
23  A  On the advice of my attorney I assert my Fifth Amendment
24     privilege.
25  Q  Are you familiar with a strip club named Trumpps?
```

Page 75

```
 1  A  On the advice of my attorney I assert my Fifth Amendment
 2     privilege.
 3  Q  Or Penthouse?
 4  A  On the advice of my attorney I assert my Fifth Amendment
 5     privilege.
 6        MS. CHANEY: I don't have any further
 7     questions.
 8        MR. GRIEM: Okay. I have no questions.
 9        MR. RYAN: I have no questions. Can I get one
10     of your cards? And could we put on the record that the
11     court reporter will take the original of the exhibits?
12        MS. CHANEY: Yes, we can do that.
13        MR. RYAN: So that's on the record? And then
14     I just need a copy of Exhibit 1. Here's the original.
15     Then I'll have copies that I'm taking with me.
16        MS. CHANEY: Can I make a copy upstairs?
17        MR. GRIEM: Absolutely.
18        REPORTER: Are you ordering this?
19        MS. CHANEY: Yes.
20        REPORTER: Do you need a copy?
21        MR. GRIEM: No.
22        (Deposition concluded at 2:56 p.m.)
23        - - -
```

Page 76

```
 1  STATE OF MICHIGAN )
 2                    ) SS.
 3  COUNTY OF OAKLAND )
 4              CERTIFICATE OF NOTARY PUBLIC
 5        I certify that this transcript is a complete,
 6  true, and correct record of the testimony of the witness
 7  held in this case.
 8        I also certify that prior to taking this
 9  deposition, the witness was duly sworn or affirmed to
10  tell the truth.
11        I further certify that I am not a relative or
12  an employee of or an attorney for a party; and that I am
13  not financially interested, directly or indirectly, in
14  the matter.
15                     Dated: February 29, 2016
16
17
18                     [signature]
19
20                     Kathryn M. DeKresz, CSR-1351
21                     Certified Shorthand Reporter
22                     Notary Public, Oakland County, MI
23                     My Commission Expires: 9-27-16
```